UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

OBRA PIA LTD., OBRA PIA (U.S.) FEEDER, LP,
KALEIL ISAZA TUZMAN and KIT CAPITAL, LTD.,          Civil Action No. 1:19-cv-07840

                              Plaintiffs,

              -against-

SEAGRAPE INVESTORS LLC and
EDWARD V. MULLEN,

                              Defendants.

-------------------------------------------------------------------X


**PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**


                              **MICHELMAN & ROBINSON, LLP**
                              800 Third Avenue, 24th Floor
                              New York, New York 10022
                              (212) 730-7700
                              *Attorneys for Obra Pia, Ltd, Obra Pia (U.S.) Feeder,*
                              *Kaleil Isaza Tuzman, and KIT Capital, Ltd.*


*Of Counsel:*
John Giardino, Esq.
Brooke K. Haley, Esq.

# Table of Contents

Page(s)

PROCEDURAL HISTORY ........................................................................ **Error! Bookmark not defined.**

OBRA PIA'S PRELIMINARY STATEMENT ........................................ **Error! Bookmark not defined.**

STATEMENT OF RELEVANT FACTS .................................................... **Error! Bookmark not defined.**

The 2013 Investment Agreement Provided No Means for Redemption of the Mullen Investments ............................................................................................................. **Error! Bookmark not defined.**

The 2014 Investment Addendum Provides for the Replacement of the Investment Parties and the Collateral and Partial Redemption ..................................... **Error! Bookmark not defined.**

Potential Sale of the Project by Obra Pia ............................................ **Error! Bookmark not defined.**

2016 Credit and Security Agreement ("CSA") .................................... **Error! Bookmark not defined.**

The 2016 Subordination Agreement ...................................................... **Error! Bookmark not defined.**

The Mullen Investors' Notice of Default ............................................. **Error! Bookmark not defined.**

Complaints to the SDS Seeking Liquidation ...................................... **Error! Bookmark not defined.**1

The Isaza Tuzman Indictment and the Mullen Investors' Attempt to Gain Control .. **Error! Bookmark not defined.**

BVI Statutory Demand ........................................................................ **Error! Bookmark not defined.**3

LEGAL STANDARD ............................................................................... **Error! Bookmark not defined.**4

ARGUMENT ........................................................................................... **Error! Bookmark not defined.**

I.   DEFENDANTS' MOTION TO DISMISS MUST BE DENIED ... **Error! Bookmark not defined.**

A.   Plaintiffs Have Stated a Claim for Breach of the Subordination Agreement .... **Error! Bookmark not defined.**5

B.   Plaintiffs Have Stated a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing ................................................................................................. 17

C.   Plaintiffs Have Stated Claims for Breach of Fiduciary Duty .................................... 19

  i.    The Mullen Investors owe a fiduciary duty in their capacity as "lenders" .................. 19
  ii.   The Mullen Investors owe a fiduciary duty in their capacity as equity partners ............ 21

D.   Plaintiffs Have Stated a Claim for Fraud .................................................................. 23

E.   Plaintiffs Have Stated a Claim for Declaratory Judgment ......................................... 24

CONCLUSION ................................................................................................................................. 26

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*19 Recordings Ltd. v. Sony Music Entm't*
  97 F. Supp. 3d 433 (S.D.N.Y. 2015).......................................................................18

*24/7 Records, Inc. v. Sony Music Entm't, Inc.*,
  429 F.3d 39 (2d Cir. 2005)......................................................................................17

*A.G. Homes, LLC v. Gerstein*,
  860 N.Y.S.2d 582 (2d Dep't 2008).........................................................................22

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................................14

*Benavidez v. Piramides Mayas Inc.*,
  2013 WL 2357527 (S.D.N.Y. May 24, 2013) ...........................................................4

*Birnbaum v. Birnbaum*,
  73 N.Y.2d 461 (1989).............................................................................................19

*Blue Chip Emerald LLC v. Allied Partners Inc.*,
  299 A.D.2d 278 (1st Dep't 2002) ...........................................................................22

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*,
  778 F. Supp. 2d 375 (S.D.N.Y 2011)......................................................................16

*Building Indus. Elec. Contractors Ass'n v. City of New York*,
  678 F.3d 184 (2d Cir. 2012)....................................................................................15

*Consol. Edison, Inc. v. Ne. Utilities*,
  426 F.3d 524 (2d Cir. 2005)....................................................................................16

*Dalton v. Educational Testing Serv.*,
  87 N.Y.2d 384 (1995)..............................................................................................17

*DiFolco v. MSNBC Cable, L.L.C.*,
  622 F. 3d 104 (2d Cir. 2010)...................................................................................15

*Dluhos v. Floating & Abandoned Vessel, Known as New York*,
  162 F.3d 63 (2d Cir. 1998)........................................................................................4

*Estrada v. Dugow*,
  2016 WL 1298993 (S.D.N.Y. Mar. 31, 2016) ...................................................19, 21

*Eurycleia Partners, L.P. v. Seward & Kissel, LLP*,
  12 N.Y.3d 553 (2009) ........................................................................................23

*Harris v. Mills*,
  572 F.3d 66 (2d Cir. 2009)................................................................................14

*Hillair Cap. Investments, L.P. v. Integrated Freight Corp.*,
  963 F. Supp. 2d 336 (S.D.N.Y 2013)...............................................................25

*Int'l Controls Corp. v. Vesco*,
  556 F.2d 665 (2d Cir. 1977)................................................................................4

*Lloyd Cap. Corp. v. Pat Henchar, Inc.*,
  80 N.Y.2d 124 (1992) .......................................................................................25

*Matter of Rothko*,
  43 N.Y.2d 305 (1977) .......................................................................................19

*Meinhard v. Salmon*,
  249 N.Y. 458 (1928) ...................................................................................19, 21

*Nathanson v. Nathanson*,
  20 A.D.3d 403 (2d Dep't 2005) ........................................................................22

*Nisselson v. Ford Motor Co. (In re Monahan Ford Corp.)*,
  340 B.R. 1 (E.D.N.Y. 2006) .............................................................................19

*Sabella v. Scantek Medical, Inc.*,
  2009 WL 3233703 (S.D.N.Y. Sept. 25, 2009)............................................24, 25

*Matter of Teltronics Servs., Inc.*,
  29 B.R. 139 (E.D.N.Y. 1983) ...........................................................................20

*TVT Records and TVT Music, Inc. v. The Island Def Jam Music Group*,
  244 F. Supp. 2d 263 (S.D.N.Y. 2003)...............................................................17

*Weinberger v. Kendrick*,
  698 F.2d 61 (2d Cir. 1982)................................................................................19

**Statutes**

Insolvency Act 2003 of the British Virgin Islands, Section 155 (1)................................................1

Insolvency Act 2003 of the British Virgin Islands, Sections 156 (1) and (2)................................1

**Other Authorities**

Rule 12(b)(6).............................................................................. *passim*

This Memorandum of Law is submitted on behalf of the Plaintiffs, referred to collectively herein as "**Obra Pia**," in opposition to the pending Rule 12 (b)(6) Motion to Dismiss this action brought by the Defendants, referred to collectively herein as "**the Mullen Investors**."[1]  Presented herein are (1) a summary of the procedural history of this dispute, (2) Obra Pia's preliminary statement, (3) a statement of relevant facts, and (4) Obra Pia's response to the arguments advanced by the Mullen Investors on their motion.

## PROCEDURAL HISTORY

These proceedings were initiated on January 21, 2019 by the Mullen Investors when they filed and served upon Obra Pia a Statutory Demand for payment in the amount of $5,099,917.39 pursuant to Section 155 (1) of the Insolvency Act 2003 of the British Virgin Islands. Amended Compl., ¶¶ 146-147.

Exercising its rights pursuant to Sections 156 (1) and (2) of the Insolvency Act, Obra Pia applied to the High Court of Justice (Commercial Division) in the British Virgin Islands (BVI) to set aside the Statutory Demand on the grounds of improper notice and wrongful conduct by the Mullen Investors giving rise to affirmative claims very much like the claims Obra Pia has asserted in this Federal Court action. *See* Declaration of Matthew J. Press ("Press Decl."), Ex. 6.

In the very same way that they seek to dismiss the present Amended Complaint, the Mullen Investors argued to the BVI High Court that the agreements between the parties preclude any and all claims or defenses by Obra Pia. *Id*.

However, after a full evidentiary hearing, Judge Adderly of the High Court ruled "*[b]ased on the evidence before me I am unable to conclude on a summary basis whether or not the applicant [Obra Pia] has a reasonable prospect of launching a claim….In my judgment there*

---

[1] Unless otherwise defined herein, capitalized terms herein shall have the meaning ascribed to them in the Amended Complaint.

1

***are triable issues relating to the complaint…***" *Id*., ¶27, p. 8.

Judge Adderly took the extraordinary measure of setting aside the Statutory Demand and, finding that New York law governs the dispute between these parties, ordered Obra Pia to commence an action asserting its claims in New York. *Id.*, ¶ 29, p. 9.

Obra Pia did exactly that by filing and serving its complaint in the Supreme Court of the State of New York County on June 24, 2019. *See* Amended Compl., ¶ 23. The Mullen Investors removed the action to this Court by noted, dated August 21, 2019. *Id*., ¶ 24.

In response to Obra Pia's original Complaint, the Mullen Investors, advancing once again the same arguments they relied upon before the BVI High Court, moved to dismiss the Complaint. Within the time required and on prior notice to both the Court and counsel for the Mullen Investors, Obra Pia filed its Amended Complaint on September 18, 2019, thereby superseding its original Complaint.

In response to Obra Pia's Amended Complaint and in the presence of a plethora of detailed factual allegations, the Mullen Investors have yet again recycled their same arguments in an attempt to dismiss the Amended Complaint on a summary basis before any evidentiary hearings or trial. Obra Pia's response is presented within.

## OBRA PIA'S PRELIMINARY STATEMENT

This dispute arises from the ongoing development of a luxury resort in the Colombian city of Cartagena. Within the walls of the old city, Obra Pia has acquired the 17th Century convent which bears the same name and has commenced its modernization in order to create one of only few world-class hospitality assets in the UNESCO-designated historical city. As with any such projects of its kind, the development encountered certain delays.

As discussed more fully herein, <u>unlike</u> Obra Pia's senior lender and other investment partners, the Mullen Investors refused to work through these development challenges and, by various wrongful means, attempted to precipitate a liquidation of the project.  As equity partners in Obra Pia and alleging to be lenders to the venture, the Mullen Investors advanced their own interests over those of Obra Pia, their partners, the senior lender, and the project itself.

As detailed in the Amended Complaint, the wrongful conduct of the Mullen Investors gives rise to the claims asserted in this action for breach of fiduciary duty, breach of contract, breach of the covenant of good faith and fair dealing, and fraud.  Furthermore, Obra Pia, in response to the Mullen Investors' attempt to characterize their investment solely as debt to be repaid at an exorbitant rate of return, has also sought declaratory judgment as to the unenforceability of any such debt obligation.

At the heart of the Mullen Investors' Rule 12(b)(6) motion and running like veins through each and every of their arguments is a simple misrepresentation.  The Mullen Investors attempt to shield themselves from liability by arguing that they had the right to "exercise any rights with respect to the collateral secured by the subordinated loan" and, in fact, did so.

However, by the clear language of the Subordination Agreement, to which they were party, the Mullen Investors held <u>no security whatsoever</u> in relation to any loans they claim to be due. The Subordination Agreement specifically provides and acknowledges that any loan held by the Mullen Investors is **unsecured** and **subordinate** to the rights of the senior lender until such time as the senior lender is paid in full.  *See* Amended Compl., Ex. 4.  As the senior lender has not been paid, even as of this date, it is undeniable that any rights of the Mullen Investors remain unsecured and completely subordinate.

At the time the Mullen Investors issued their "notice of default" (*see* Amended Compl., ¶ 115) and, more importantly, took the actions they did with the SDS in Colombia (*see* Amended Compl., ¶¶ 118-144) and under the Insolvency Act in the British Virgin Islands with the intention of causing a liquidation of the assets of Obra Pia (*see* Amended Compl., ¶¶ 145-147) , they had no such rights.  As alleged in the Amended Complaint, these acts caused harm to Obra Pia and give rise to the causes of action asserted.

In fact, by admitting their attempt to foreclose upon the assets of Obra Pia, in which they had no security interest or prior right whatsoever, the Mullen Investors concede the very wrongful conduct that forms the basis for Obra Pia's claims against them and necessitates denial of their motion to dismiss.

As to the motion itself, the Mullen Investors dedicate an inordinate amount of attention to the initial complaint filed in this action – a complaint which has been superseded and is of absolutely no effect.[2]  Throughout their motion papers, the Mullen Investors attempt to create a shadow play putting forward prior pleadings, procedural events, and even documents that are completely irrelevant to the allegations of the Amended Complaint.  With much theatrical flair, they allege former counsel was "*compelled to withdraw, and head for the hills*," current counsel has "*fiendishly devised*" a "*faux counterweight*," the Amended Complaint is the "*frivolous cousin*" of the initial complaint, and that the claims are merely attempts to "*maliciously tarnish*" the Mullen Investors' reputation.

---

[2] *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977), *cert. denied*, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 758 (1978) holding that "an amended complaint ordinarily supersedes the original and renders it of no legal effect." *See also Dluhos v. Floating & Abandoned Vessel, Known as New York*, 162 F.3d 63, 68 (2d Cir. 1998) ("The magistrate judge was correct to look only to the allegations in Mr. Dluhos's most recent complaint as 'it is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect'")(internal citations omitted); *see also Benavidez v. Piramides Mayas Inc.*, 2013 WL 2357527, *4 (S.D.N.Y. May 24, 2013) adding further color and analysis under *Vesco*.

As in Hamlet's famous shadow play, we think the Mullen Investors do protest too much.

If one turns his or her attention to the very specific factual allegations of the Amended Complaint, which on this motion <u>must</u> be accepted as true, Obra Pia has properly stated significant causes of action for breach of fiduciary duty, breach of contract, breach of the covenant of good faith and fair dealing, fraud, and declaratory judgment.[3]

The factual and legal bases for each cause of action and Obra Pia's responses to the challenges raised by the Mullen Investors are set forth below.  Upon review of these arguments, it will be clear that the Mullen Investors' motion to dismiss must be denied in its entirety.

## STATEMENT OF RELEVANT FACTS

The Amended Complaint alleges in sufficient detail the facts upon which each of Obra Pia's five causes of action are asserted.  When accepted as true, these facts clearly establish the plausibility of each of Obra Pia's five causes against the Mullen Investors.

Although the facts lay out a complicated and circuitous relationship between Obra Pia, the Mullen Investors, their respective predecessors, and their principals, two central themes emerge:

> *first,* the investment made by the Mullen Investors is represented by a complicated series of transactions and transactional documents that treat the invested funds in different ways and attribute different values and rights to the invested interests, and

> *second*, lacking a means by which to force a redemption of their invested interests, the Mullen Investors resorted to wrongful and even deceitful means to force a liquidation of the Obra Pia assets.

Mullen and Isaza Tuzman have had a long-standing business and personal relationship which precedes the formation of Obra Pia by many years.  Amended Compl., ¶ 6.  Prior to his

---

[3] In their Memorandum of Law ("Defs. MOL"), Counsel for the Mullen Investors has addressed Plaintiffs' claims out-of-order. For the Court's convenience, Obra Pia presents its arguments on each cause of action in the order they appear in the Mullen Investors' Memorandum.

investment in Obra Pia, Mullen through an entity known as "Oaktree" invested in companies sponsored by Isaza Tuzman, including a company known as "KIT Media, Ltd." *Id.*, ¶ 27.

On or about April 30, 2013, Mullen and Oaktree initiated their investment in the Obra Pia project (the investment was not in Obra Pia itself) by making two capital contributions:

1. a "roll-over" of the proceeds from previous investments in KIT Media, Ltd. made prior to April 1, 2012 which the parties valued at $1,885,513, and
2. an additional capital contribution in the amount of $1,850,000.[4] (*Id.*, ¶ 30).

All of the invested funds were expressly contributed as capital, not as loans. The Mullen/Oaktree investment was memorialized in a contemporaneous agreement entitled "Investment Agreement." *Id.*, ¶ 31. The 2013 "Investment Agreement" was the start of a complicated series of agreements which, as described in the Amended Complaint and herein, continued through 2016. Amended Compl., ¶ 7.

This series of agreements interchanged equity interests in and debt obligations of Obra Pia, commingling (1) the capital amounts associated with these interests, (2) the earnings to be paid on these interests,[5] and (3) the respective rights of the parties with respect to these interests. Amended Compl., ¶ 12. As discussed below, the 2014 Addendum repeatedly states that the capital contributions are not loans and the earnings on those contributions are not interest payments.

As alleged in the Amended Complaint, the Mullen Investors have held themselves out as both investors in and creditors[6] of Obra Pia, *depending upon* which classification of interests was most advantageous *to them* at any given time in order to advance *their interests* and always *to the detriment of* Obra Pia, their equity partners, the senior lender, other creditors of Obra Pia, and the project itself. Amended Compl., ¶ 15.

---

[4] See 2013 Investment Agreement and 2014 Investment Addendum.

[5] In numerous provisions in the agreements, the Mullen Investors, recognizing the exceedingly high returns to be paid on their investments insist that such earnings not be treated as "interest." *See, e.g.*, 2014 Investment Addendum, § 3.12.

[6] When claiming to be creditors, the Mullen Investors invariably fail to identify their subordinated status.

<u>The 2013 Investment Agreement Provided No Means</u>
<u>for Redemption of the Mullen Investments</u>

The 2013 Investment Agreement did not provide the Mullen Investors with any means by which they could cause a redemption of their investment shares. *Id*., ¶ 36.  The agreement provided only that, in the event of a declared default under the agreement, the Mullen Investors' sole remedy was to foreclose upon its interest in the collateral securing the investment. *Id*., ¶ 38.

At this time, the collateral for the Mullen Investors' investment consisted of two parcels of real property unrelated to the Obra Pia project, one parcel located in Cannes, France and the other in Park City, Utah. *Id*., ¶ 32 The Mullen Investors never declared a default under the 2013 Investment Agreement and never took any action with respect to the real property collateral. *Id*., ¶¶ 39-40.

<u>The 2014 Investment Addendum Provides for the Replacement</u>
<u>of the Investment Parties and the Collateral and Partial Redemption</u>

Recognizing that the initial 2013 Investment Agreement did not provide for redemption of the Mullen Investors' interests, the parties executed an amendment to the Investment Agreement on September 19, 2014. *Id*., ¶ 41. The 2014 Investment Addendum created various rights and obligations of which the following, among others, are significant to this dispute Seagrape Investors, LLC was substituted for Mullen and Oaktree as the "**Investor**." *Id*., ¶ 42.

Obra Pia agreed to a partial redemption of the shares of the Mullen Investors in the amount of $50,000, to pay a "Delay Preferred Return" in the amount of 10%, and to make eight (8) successive redemptions of equity interests over the next six months with each redemption payment carrying with it a penalty provision if paid late. *Id*., ¶¶ 52, 58.  In all instances, the Mullen Investors made clear that "Delay Preferred Returns," the redemption payments, and the penalties payable

thereon were not "interest payments" seeking to avoid usury consequences that may result from the high rates of return sought by such payments.  *See* 2014 Investment Addendum, § 3.12.

The 2014 Investment Addendum expressly states that the Mullen Investors' participation in Obra Pia was in the nature of investors, <u>not lenders</u>, and that the return on their investment was in the nature of earnings on equity, <u>not interest payments</u>. *Id*., p. 8, § 3.12

Potential Sale of the Project by Obra Pia

From the inception of the Obra Pia project, all parties understood that the development of a world class resort in the ancient city would take years to complete and reach operational status. Amended Compl., ¶ 67.  Given the very nature of the venture, Mullen repeatedly expressed to Isaza Tuzman, both orally and in writing, that he viewed his investment as being "tantamount to equity" and that he never expected the investment made by the Mullen Investors to be redeemed by the dates set forth in either the 2013 Investment Agreement or the 2014 Investment Addendum. *Id*., ¶ 68.

Notwithstanding those assurances, the Mullen Investors pressured Obra Pia and Tuzman to sell the project as a source of funds to pay out the Mullen Investors' investment and high returns. *Id*., ¶ 69.  As a result, Obra Pia agreed to pursue a third-party sale of the yet-to-be-completed project or part of it. *Id*.

True to their word, Obra Pia attracted such interest in a sale and on August 23, 2016 entered into a Letter of Intent with a third party known as "GACP Latin America" to sell a majority interest in the project (the "GACP LOI").  *Id*., ¶ 72. At this time the total valuation of the project was $50,200,000 as established by an updated independent appraisal. *Id*., ¶ 73.

At the time it entered into the GACP LOI, Obra Pia had not made the redemption or preferred payments as set forth in the 2104 Investment Addendum.  However, in the presence of

both the GACP LOI and the substantial project valuation, the Mullen Investors approved and consented to the GACP LOI and sale of the majority interest in the project. *Id.*, ¶ 78.  In doing so, they sought to restate their investment interests and so, contemporaneously with execution of the GACP LOI, the Mullen Investors and Obra Pia entered into a "Credit and Security Agreement." *Id.*, ¶ 79.

<u>2016 Credit and Security Agreement ("CSA")</u>

On August 25, 2016, two days after signing the GACP LOI, the Mullen Investors and Obra Pia executed the CSA which expressly provided that the 2013 Investment Agreement and 2014 Investment Addendum were "*ratified and confirmed in their entirety*" unless expressly superseded by the terms of the CSA. *Id.*; *see* CSA (emphasis added).  The CSA recites that monies "*owed*" to the Mullen Investors relate to "funds lent and invested, and penalties and interest levied…over time" even though no prior transaction between the parties had ever been in the nature of a loan or interest payment.  *See* CSA, p. 19.  In fact, the prior agreements, which are expressly ratified, specifically state that the transactions were <u>not loans</u> and the payments made or to be made were <u>not in the nature of interest</u>.

The CSA is completely silent as to the amount of funds that represent investments, or loans, or interest, or penalties. *See* CSA. Nowhere within the four corners of the document are Mullen Investors   identified as "creditors" or "lenders." *Id*.  And that is for the simple reason that they are not lenders – they are, like other investors in the project, owners of limited partnership or other investment interests in the Obra Pia entities.

The CSA, for the very first time, refers to Isaza Tuzman, Obra Pia Management, GP, KIT Capital (Nevis) LLC, Obra Pia and the Branch as "Debtors" even though there is no articulation

whatsoever of the amount of debt or the means by which prior capital investments were converted to debt. *See* CSA, p. 19.

Importantly, § 11 of the CSA explicitly provides that "Seagrape shall exercise best efforts to support Debtors' sale of all or a portion of the Project that would result in repayment of the Cash Amount due, and shall in no event do anything to block such a sale." CSA, § 11.

The 2016 Subordination Agreement

Within two months of the execution of the CSA, on October 14, 2016, GACP Cartagena LLC ("GACP Cartagena") as "Senior Lender," Seagrape Investors, Obra Pia U.S. Feeder, Obra Pia (non-U.S.) Feeder, LP, and KIT Capital as "Subordinated Lenders," and Obra Pia as "Borrower" executed the Subordination Agreement. Amended Compl., ¶ 97. The Subordination Agreement referenced the Investment Agreement, the 2014 Addendum, and the CSA and superseded all prior written agreements "as appropriate" *Id*., ¶ 98.

Pursuant to the Subordination Agreement, the Mullen Investors acknowledged and agreed they were a ***subordinated lender and junior in right and payment*** to the loan by GACP to Obra Pia in the amount of $1,500,000 (the "Senior Loan"):

> "Subordinated Lenders and Borrower agree that all debt owed by Borrower to any of the Subordinated Lenders is and shall be subordinate and junior in right of payment to the prior payment in full of the Senior Loan and the obligations under the Senior Loan Documents . . .". *See* Subordination Agreement, § 1(a); Amended Compl., ¶ 99.

The Mullen Investors also agreed that, ***until all Senior Debt has been paid***, "[t]he amounts due to the Subordinated Lender are either (a) ***unsecured*** or (b) such security interest has not been *perfected*." *See* Subordination Agreement, § 5(f) (emphasis added).

The Mullen Investors further agreed that they "shall not declare a default with respect to any Subordinated Loan or exercise any rights with respect to any collateral securing the

10

Subordinated Loans without providing [GACP Latin America] at least three (3) months advanced [sic] notice." *See* Subordination Agreement, §1(a).

The exercise of rights with respect to any collateral securing the Subordinated Loans in effect means that the Mullen Investors has no such rights whatsoever because as provided in § 5(f) of the Subordination Agreement, no assets secured the Subordinated Loan.

<u>The Mullen Investors' Faulty Notice of Default</u>

Upon information and belief, on or about April 27, 2017, counsel for the Mullen Investors notified GACP that the Mullen Investors intended "to declare a default by, among other parties, Borrower under [the Mullen Investors'] Subordinated Loans and otherwise exercise any and all rights and remedies with respect to any collateral securing said Seagrape Subordinated Loans (which may include, without limitation, the filing of a foreclosure action in Colombia." Amended Compl., ¶ 115. However, once again, as clearly stated in the Subordination Agreement, there was no perfected or secured collateral upon which the Mullen Investors were entitled to foreclose. *See* Subordination Agreement, § 5(f).

<u>Complaints to the SDS Seeking Liquidation</u>

It is at this point that the Mullen Investors resorted to wrongful means to force a redemption of their interests. On November 6, 2017, despite their position as a subordinated and unsecured lender, the Mullen Investors filed a complaint with the SDS alleging that the Obra Pia entities had defaulted in payment obligations owed to the Mullen Investors and Barrera & Barrera, a Colombian architectural firm. Amended Compl., ¶ 118. The legal predicate for filing a request for liquidation with the SDS is the presence of two (2) unpaid creditors. The Mullen Investors, as equity partners, knew that Barrera & Barrera was *not* an unpaid creditor at the time of the filing of the SDS complaint. *Id*., ¶¶ 120, 123.

In fact, on November 27, 2017, Barrera & Barrera withdrew its participation in the SDS complaint advising the SDS that *it had been improperly induced by the Mullen Investors* to participate in the liquidation request.  *Id*., ¶¶ 124, 125.  However, the damage was already done as Obra Pia had already been placed under SDS supervision and potential liquidation, which proceedings continue after withdrawal of one, or even both, creditors. *Id*., ¶ 126.

Critically, the Mullen Investors did not disclose to the SDS that the Mullen Investors were, in fact, <u>subordinate</u> to GACP and had no priority over other investors or creditors of Obra Pia (US) Feeder.  *Id*., ¶ 128.  The filing of the SDS complaint had the effect of creating a government lien on the project and impaired Obra Pia's ability to pursue or consummate a sale or refinancing.

In fact, the harm to Obra Pia was so significant that GACP withdrew its expressed intent to purchase a majority intertest in the project.  *Id*., ¶ 132.  Remarkably, thereafter, the Mullen Investors filed a second SDS complaint on or about October 18, 2018, again making spurious and inflammatory false claims and misrepresenting their right to receive payment. *Id*., ¶ 133.

The Mullen Investors filed the SDS complaints in order to circumvent the Subordination Agreement which expressly prohibited payment of the Mullen Investors' subordinated and unsecured debt.  *Id*., ¶ 135.  The filing of the SDS complaints and the false allegations contained within them directly resulted in the substantial loss of the value in the project (*id*., ¶ 137) and caused Obra Pia to incur extraordinary costs including legal fees, accounting fees, and other expenses (*id*., ¶ 141).

In the end, after nearly two years of intensive inquiry and on-site due diligence, the SDS investigation uncovered no evidence of the wrongdoing. *Id*., ¶ 143.  Indeed, the SDS supervisory process refuted the Mullen Investors' claims that Obra Pia was insolvent and mismanaged. *Id*., ¶ 144.

The Isaza Tuzman Indictment and the Mullen Investors' Attempt to Gain Control

In August 2015, an indictment was brought against Isaza Tuzman by the U.S. Attorney for the Southern District of New York arising from allegations completely unrelated to Obra Pia. Amended Compl., ¶ 60. Isaza Tuzman was arraigned and released with certain travel restrictions upon his posting of adequate security and a personal-recognizance bond ("PRB"). *Id*., ¶ 61. The PRB was endorsed on behalf of Isaza Tuzman by eight individuals, including Mullen. *Id*. Significantly, the PRB allowed Isaza Tuzman to continue to devote professional efforts to the Obra Pia project. *Id*., ¶ 62.

Two years after the indictment, and after the Mullen Investors' failed attempt to force a liquidation through the SDS proceedings, Mullen withdrew his endorsement from the PRB. *Id*., ¶ 63.  Mullen did so in order to in an attempt to cause the revocation of the bond and Isaza Tuzman's release, exert leverage against Isaza Tuzman, and gain control over Obra Pia.  *Id*., ¶ 64. Fortunately, Isaza Tuzman was able to secure another endorsement on the PRB and avoid the consequences of Mullen's hostile action. *Id*., ¶ 65.

BVI Statutory Demand

When all other subversive tactics failed, the Mullen Investors resorted to the British Virgin Islands to file yet another petition seeking dissolution of Obra Pia.  Amended Compl., ¶ 145.  On January 21, 2019, the Mullen Investors served the BVI Statutory Demand claiming to be owed $5,099,917.49 but again failing to disclose the prohibition on payment to them created by the Subordination Agreement. *Id*., ¶¶ 146-147.  By Judgment dated May 22, 2019 the High Court set aside the Statutory Demand, and further held "it was conceded that from the time notice was given the payment did not in fact fall due until the end of August 2017 (not 31 March as submitted in written submission).  On its face, therefore, the complaint [to the SDS] was made prematurely

which it appears could only be made when the debtor was 90 days in arrears.  It also appears that the complaint may have been induced by the charges in relation to fraud against, Mr. Tuzman . . .”  *See* Press Decl., Ex. 6, BVI Judgment, p. 8-9.

The BVI Judgment further directed Plaintiffs to bring their claims against the Mullen Investors in New York and resulted in an Order granting Plaintiffs monetary relief against Seagrape Investors.  *Id*., p. 9.  The Mullen Investors efforts were once again thwarted.

As detailed above and in the Amended Complaint, in order to force repayment of their investment in the absence of a redemption and in contravention of their contractual status as subordinated and unsecured “lenders,” the Mullen Investors engaged in wrongful conduct in the form of personal actions against Isaza Tuzman, false complaints, and efforts to liquidate Obra Pia. By their wrongful conduct, the Mullen Investors breached (i) fiduciary duties; (ii) the terms of the Subordination Agreement; and (iii) the implied covenant of good faith and fair dealing, and further engaged in fraud.

## LEGAL STANDARD

When deciding a Rule 12(b)(6) motion to dismiss a complaint for failure to state a claim, the Court must assume the truth of the facts asserted in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. *See Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009).  “A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.” *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). Further, in evaluating a Rule 12(b)(6) motion to dismiss, a court may consider “only the complaint and any documents attached thereto or incorporated by reference and documents upon which the complaint

relies heavily." *Building Indus. Elec. Contractors Ass'n v. City of New York*, 678 F.3d 184, 187 (2d Cir. 2012) (internal citations omitted).

In light of these well-settled principles, the Court should disregard the Mullen Investors' lengthy, self-serving, and inaccurate resuscitation of the "facts" as well as exhibits annexed to the Declaration of Matthew Press ("Press Decl."), including the original complaint (Exhibit 2), a self-described "warning" letter regarding the original complaint (Exhibit 7), and a copy of a press release regarding Isaza Tuzman's indictment (Exhibit 3).[7]  All of these materials are irrelevant to the Amended Complaint.

Accordingly, the Court should decline to consider these extraneous documents, and by extension, the Mullen Investors' self-serving recitation of "facts" which incorporate these irrelevant materials.  *See DiFolco v. MSNBC Cable, L.L.C.*, 622 F. 3d 104, 111 (2d Cir. 2010).

## ARGUMENT

### I.     DEFENDANTS' MOTION TO DISMISS MUST BE DENIED

#### A.  Plaintiffs Have Stated a Claim for Breach of the Subordination Agreement

The Mullen Investors concede the very conduct that forms the basis of Plaintiffs' claim for breach of the Subordination Agreement.  On this ground alone, the motion to dismiss such claim must be denied.

By the express language of the Subordination Agreement, the Mullen Investors acknowledged their position as "subordinate and junior in right to the prior payment in full of the Senior Loan, and the obligations under the Senior Loan Documents." *See* Subordination Agreement, § 1(a).  The Mullen Investors further agreed that, until all Senior Debt has been paid,

---

[7] In addition, the correspondence annexed as Exhibits 4 and 5 is neither integral to nor incorporated by reference in the Amended Complaint.  Exhibit 8 should be similarly disregarded as the Mullen Investors point to no document that suggests that BVI law governs any aspect of this litigation.

"*[t]he amounts due to the Subordinated Lender are either (a) unsecured or (b) such security interest has not been perfected*." *See* Subordination Agreement, § 5(f) (emphasis added).

The language and intention of the Subordination Agreement is clear: the Mullen Investors had no secured interest upon which to foreclose upon absent the full payment to the Senior Lender of the Senior Debt, which has not occurred.  Despite acknowledging that the Senior Debt has not been repaid, the Mullen Investors concede that, in contravention of the express terms of the Subordination Agreement, they filed the SDS complaints and the BVI Statutory Demand, alleging non-payment of amounts owed to the Mullen Investors (without disclosing their subordinated and unsecured position) and seeking dissolution of Obra Pia. *See* Defs. MOL, p. 13-15.  Such breach of the Subordination Agreement has caused damages to Plaintiffs.  *See* Amended Compl., ¶ 193.

Moreover, the Mullen Investors' last-ditch claim that Plaintiffs do not have standing to enforce a contract *to which they are party* is not supported by the Subordination Agreement itself, law, or basic logic.  As is plain on the face of the Subordination Agreement, Plaintiffs Obra Pia Ltd., Obra Pia (U.S.) Feeder, L.P., and KIT Capital LLC are parties to the Subordination Agreement.  Moreover, the Subordination Agreement expressly provides that the "[Subordination] Agreement, and the terms, conditions, covenants, and conditions hereof, shall be binding upon and *inure to the benefit of the parties hereto*, and their respective heirs, personal representatives, successors and assigns."  *See* Subordination Agreement, § 8 (emphasis added).   It is beyond reproach that a party to a contract, to whom the benefit of the contract expressly inures, has standing to enforce its terms.[8]

---

[8] Moreover, the case law relied upon by the Mullen Investors only serves to support Plaintiffs' standing. *See Consol. Edison, Inc. v. Ne. Utilities*, 426 F.3d 524 (2d Cir. 2005) (denying non-party shareholder standing where merger agreement specifically prohibited the exercise of rights or remedies by any person other than the parties to the agreement); *see BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 778 F. Supp. 2d 375 (S.D.N.Y. 2011) (denying non-parties to a deposit agreement standing under derivative and third-party beneficiary theories where the deposit agreement expressly barred enforcement by unidentified third parties).

The Mullen Investors concede (i) the Obra Pia Plaintiffs are party to the Subordination Agreement (*see* Defs. MOL, p. 13); (ii) the underlying conduct which serves as the basis for Plaintiffs' breach of contract claim (*id.*); and (iii) Plaintiffs have properly pled their breach of contract claim.[9] *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 429 F.3d 39, 42 (2d Cir. 2005).

Accordingly, the Mullen Investors' motion to dismiss Plaintiffs' breach of contract claim must be denied in its entirety.

### B. Plaintiffs Have Stated a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

It is axiomatic that implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance. *See Dalton v. Educational Testing Serv.*, 87 N.Y.2d 384, 380 (1995). The Mullen Investors argue that Plaintiffs' breach of covenant claim is: (i) barred by the language of § 11 of the CSA; and (ii) duplicative of the breach of contract claim. *See* Defs. MOL, pp. 16-17. Each position is belied by the language of the CSA and the Amended Complaint.

First, § 11 of the CSA— the very same provision upon which the Mullen Investors purport to rely— provides a reasonable expectation that the Mullen Investors breached in violation of their implied duty of good faith and fair dealing. *See TVT Records and TVT Music, Inc. v. The Island Def Jam Music Group*, 244 F. Supp. 2d 263, 278 (S.D.N.Y.2003) (the covenant of good faith protects a promisee against "breach of the reasonable expectations and inferences otherwise derived from the agreement."). More specifically, § 11 of the CSA explicitly provides: "Seagrape shall exercise best efforts to support Debtors' sale of all or a portion of the Project that would result in repayment of the Cash Amount due, and shall in no event do anything to block such a sale." *See* CSA, § 11.

---

[9] The Mullen Investors do not challenge the adequacy of Plaintiffs' pleading of their claim for breach of the Subordination Agreement, and accordingly, have waived any such defense.

Given the express language of § 11 of the CSA, Plaintiffs' reasonable expectations under the relevant agreements included that the Mullen Investors would not intentionally undertake conduct to personally injure Isaza Tuzman or to sabotage the value of the Development.  However, despite such reasonable expectation, approximately one year after their execution of the CSA, the Mullen Investors withdrew Mullen's signature from Isaza Tuzman's PBR in order to gain leverage against Isaza Tuzman and Obra Pia, and undertook deliberate actions to tarnish the business reputation of the Development including but not limited to the filing of the first misrepresentative SDS complaint.[10]  *See* Amended Compl., ¶¶ 19, 63-64.

Second, Plaintiffs' claim for breach of the implied covenant claim is a stand-alone claim as Plaintiffs' breach of implied covenant claim arises under each of the 2013 Investment Agreement, 2014 Investment Addendum, CSA and Subordination Agreement, whereas Plaintiffs' cause of action for breach of contract arises only under the Subordination Agreement.  *See* Amended Compl., ¶¶ 194-205.  Also, Plaintiffs allege separately under their breach of implied covenant claim that the Mullen Investors took actions to intentionally injure Isaza Tuzman and sabotage the value of the Development, impairing Plaintiffs' ability to sell or market the Development, and the damages alleged under each claim are different.  *See* Amended Compl., ¶¶ 193, 200, 205.

Accordingly, the Mullen Investors' motion to dismiss Plaintiffs' claim for breach of the implied duty of good faith and fair dealing must be denied in its entirety. *See 19 Recordings Ltd. v. Sony Music Entm't,* 97 F. Supp. 3d 433, 443 (S.D.N.Y. 2015) (Abrams, J.) (denying motion to

---

[10] Uncoincidentally, following the Mullen Investors' filing of the first SDS complaint, GACP withdrew from its expressed intent (of which the Mullen Investors had been aware for at least a year) to purchase the Development. Amended Compl., ¶ 132.  Moreover, the value of the Development diminished and subsequent letters of intent to purchase the Development were also abandoned, in large part because of the continued SDS supervisory status, which should never have been initiated in the first place.  Amended Compl., ¶¶ 137-139.

dismiss breach of duty of good faith and fair dealing claim where the plaintiff sufficiently alleged the defendant acted in bad faith with regard to reasonable expectations under the relevant agreement).

### C.  Plaintiffs Have Stated Claims for Breach of Fiduciary Duty

> i.  <u>The Mullen Investors owe a fiduciary duty in their capacity as "lenders"</u>

In alleging that Plaintiffs' claim for breach of fiduciary duty against the Mullen Investors in their capacity as "lenders" should be dismissed, the Mullen Investors, in a disturbing trend, mischaracterize the allegations of the Amended Complaint and the language of relevant agreements.

It is well-established that a lender that exercises control over the borrower's business must place its duty of loyalty to the company over that of its interests in its capacity as a lender.  *See Weinberger v. Kendrick*, 698 F.2d 61, 79 (2d Cir. 1982); *see also Estrada v. Dugow*, 2016 WL 1298993, at *5 (S.D.N.Y. Mar. 31, 2016) (citing *Birnbaum v. Birnbaum*, 73 N.Y.2d 461 (1989)).

The New York Court of Appeals in *Birnhaum*, 72 N.Y.2d at 466, held that "it is elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect." 72 N.Y.2d at 466 (citing *Meinhard v. Salmon*, 249 N.Y. 458, 463-64 (1928)); *see also Matter of Rothko,* 43 N.Y.2d 305, 319 (1977). This is a "sensitive and 'inflexible' rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty." *Birnbaum,* 73 N.Y.2d at 466 (internal citations omitted). The fiduciary is, therefore, mandated to "single-mindedly pursue the interests of those to whom a duty of loyalty is owed." *Id.*  "A fiduciary relationship may exist between the debtor and creditor when there is a relationship of confidence, trust, or superior knowledge or control." *Nisselson v. Ford Motor Co. (In re*

*Monahan Ford Corp.*), 340 B.R. 1, 41 (E.D.N.Y. 2006); *see also Matter of Teltronics Servs., Inc.*, 29 B.R. 139, 170 (E.D.N.Y. 1983) (recognizing that a lender may be held to a fiduciary standard where it exercises control over a borrower). In instances such as here, where a lender exercises control over the decision-making processes of the debt the lender may be held accountable under a fiduciary standard. *Matter of Teltronics*, 29 B.R. at 170 ("once the creditor . . . insists upon affirmative participation in the entrepreneurial effort being financed . . . he has entered into a relationship whose expected extraordinary economic benefit justifies the requirement of special obligations") (internal citations omitted).

While the breadth of case law the Mullen Investors purport to rely upon involve distinguishable *motions for summary judgment* after which the parties have inevitably had the benefit of discovery (which is not the case here), the Mullen Investors inarguably concede that a lender may owe fiduciary duties to a borrower. *See* Defs. MOL, p. 18. To circumscribe such law, however, the Mullen Investors conclusively (but inaccurately) argue that Plaintiffs have not pled any special relationship, and, in any event, the Mullen Investors simply exercised their rights as "creditors" under the CSA. *See* Defs. MOL, p. 18. Again, each position is belied by the Amended Complaint and relevant agreements.[11]

In support of their claim for breach of fiduciary duty against the Mullen Investors in their capacity as a lender, Plaintiffs have alleged, at a minimum, the Mullen Investors (i) owe a fiduciary duty to Plaintiffs as "lenders;" (ii) have played an essential role in driving the strategic planning of the Development; (iii) exercise a level of control over the borrower's business; (iv) are in a relationship of confidence, trust, or superior knowledge or control; and (v) through a series of bad

---

[11] The Mullen Investors' last-resort argument that Plaintiffs' breach of fiduciary duty claim is duplicative of their breach of contract claim is unavailing. *See* Defs. MOL, p. 19. Plaintiffs' breach of contract claim arises from the Mullen Investors' breach of the Subordination Agreement, whereas, Plaintiffs' breach of fiduciary duty claim arises from duties owed outside of solely the Subordination Agreement. *See* Amended Compl., ¶¶ 167-184.

acts, acted in contravention to the duties owed to Plaintiffs as well as the best interest of the Development. Amended Compl., ¶¶ 167-184.

Moreover, in arguing the Mullen Investors simply exercised creditor rights under the CSA (Defs. MOL, p. 18-19), the Mullen Investors blatantly ignore their contractually conceded position as *subordinated and unsecured lenders* (*see* Subordination Agreement) and § 11 of the CSA, which requires the Mullen Investors to exercise best efforts to support Debtors' sale of all or a portion of the Development and to refrain from any conduct to prevent such sale.

As discussed previously, the Mullen Investors did not simply exercise "creditor rights," because there were no rights the Mullen Investors could exercise. Rather, the Mullen Investors intentionally and wrongfully declared defaults under the CSA, filed false claims with the SDS (wrongfully inducing Barrera & Barrera to participate in the same), and wrongfully sought the dissolution of Obra Pia, despite having no right to redemption, no secured collateral upon which to foreclose, and no right to repayment prior to the full payment of the outstanding Senior Loan. The Mullen Investors intended to and did cause harm to Plaintiffs in advancing their self-serving interests. Amended Compl., ¶¶ 174-184.

Plaintiffs have adequately alleged a claim for breach of fiduciary duty against the Mullen Investors in their capacity as "lenders" and the Mullen Investors' motion to dismiss such claim must be denied.

ii.   The Mullen Investors owe a fiduciary duty in their capacity as equity partners

Pursuant to well-settled New York law, the Mullen Investors owe a fiduciary duty to Plaintiffs as members of a joint venture. New York courts have held *"joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty."* *Meinhard*, 249 N.Y. at 463-64 (emphasis added); *see Estrada,* 2016 WL 11298993, at *5; *see also*

*Nathanson v. Nathanson*, 20 A.D.3d 403 (2d Dep't 2005).  Furthermore New York courts have repeatedly recognized this duty as the "duty of undivided and undiluted loyalty." *Blue Chip Emerald LLC v. Allied Partners Inc.*, 299 A.D.2d 278, 279 (1st Dep't 2002); *see also A.G. Homes, LLC v. Gerstein*, 860 N.Y.S.2d 582, 584 (2d Dep't 2008).

The Mullen Investors' argument in support of dismissal of Plaintiffs' first cause of action for breach of fiduciary duty against the Mullen Investors in their capacity as equity partners is nearly identical to their argument relating to Plaintiffs' second cause of action for breach of fiduciary duty in their capacity as "lenders," and fails for identical reasons.

First, for purposes of analyzing a motion to dismiss pursuant to Rule 12(b)(6), Plaintiffs have properly alleged a breach of fiduciary duty claim against the Mullen Investors in their capacity as equity partners in the Development and limited partners in Obra Pia, including the existence of a duty, a breach thereof by the Mullen Investors, and resulting damages.    *See* Amended Compl., ¶¶ 150-166. Second, for the reasons stated above, the Mullen Investors did not exercise, and could not have exercised, "creditor rights" where no ripe right existed.  Third, for the reasons stated above, Plaintiffs' breach of fiduciary duty claim is not duplicative of their breach of contract claim.

Finally, the Mullen Investors cannot support application of BVI law herein and point to no document that requires the application of BVI law.[12]  It is indisputable that the Mullen Investors' equity interest in Obra Pia arises from the 2013 Investment Agreement, the 2014 Addendum, and the CSA, each of which are governed by New York law. In addition, the BVI has already

---

[12] Moreover, Seagrape Investors has asserted a breach of fiduciary duty claim under New York law against Isaza Tuzman and BVI Obra Pia entities in its related Complaint, filed on October 22, 2019 under Case No. 1:19-cv-09736. Any position to the contrary herein is entirely disingenuous and must be disregarded.

disclaimed jurisdiction or interest in such claims, directing Plaintiffs to raise their claims and defenses against the Mullen Investors in New York.  *See* Press Decl., Ex. 6, BVI Judgment, p. 9.

Accordingly, the Mullen Investors' motion to dismiss Plaintiffs' first cause of action for breach of fiduciary duty must be denied.

### D.  Plaintiffs Have Stated a Claim for Fraud

Under New York law, the elements of a cause of action sounding in fraud are "a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages." *Eurycleia Partners, L.P. v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009). The Mullen Investors' discussion of Plaintiffs' fraud cause of action is as cursory as it is unavailing.

Notably, the Mullen Investors concede that they made misrepresentations of fact to the Colombian SDS (*i.e.* the failure to disclose that the Mullen Investors were subordinated to GACP and *pari passu* with other creditors), which led to an investigation and period of investigation which Plaintiffs allege resulted in damages.  *See* Defs. MOL, p. 23.  However, the Mullen Investors somehow argue that because the conceded misrepresentations were not made directly *to the Plaintiffs* and the resulting period of SDS supervision is over, so there can be no fraud.[13] *Id*. Of course, the Mullen Investors offer no legal precedent for such claims.

At a minimum, Plaintiffs have alleged: (i) the Mullen Investors, in their SDS complaints and BVI statutory demand, made material misrepresentations of fact (*see* Amended Compl., ¶¶ 207-208, 218-219); (ii) the Mullen Investors intended for *Plaintiffs*, as well as the SDS, to rely on their false statements and representations (*see* Amended Compl., ¶ 213, 220); (iii) in responding

---

[13] The Mullen Investors intentionally mischaracterize the SDS Resolution.  In reality, the SDS Resolution reflects that the Branch was exonerated. *See* Amended Compl., Exhibit 5.

to the SDS supervision and investigation as well as the BVI Statutory Demand, Plaintiffs reasonably and justifiably relied on the Mullen Investors' false statements and representations (*see* Amended Compl., ¶ 213, 220); (iv) as a result of the Mullen Investors' intentionally false statements and omissions in the SDS complaints and BVI Statutory Demand, Plaintiffs have incurred damages including the unnecessary and significant defense costs, as well as the resulting decrease in value of the Development (*see* Amended Compl., ¶¶ 209-210, 214-217, 221-222).

The sufficiency of Plaintiffs' fraud claim is further supported by the BVI Judgment setting aside the Mullen Investors' statutory demand, and further holding, in relevant part:[14]

> On its face, therefore, the complaint [to the SDS] was made prematurely . . . It also appears that the complaint may have been induced by the charges in relation to fraud against, Mr. Tuzman . . ."

*See* BVI Judgment, p. 8-9.

While there is no requirement of unassailable proof at the pleading stage, Plaintiffs have more than adequately alleged facts to establish the elements of a cause of action for fraud against the Mullen Investors and resulting damages. *See* Amended Compl., ¶¶ 206-222. Thus, the Mullen Investors' motion to dismiss Plaintiffs' fraud claim must be dismissed in its entirety.

### E.  Plaintiffs Have Stated a Claim for Declaratory Judgment

The Mullen Investors' defense of the usurious terms of the "loans" they purport to have made to Obra Pia, on the basis that the amount of the "loans" exceed $2.5 million, is entirely disingenuous. *See* Defs. MOL, p. 24.

First, a party may not aggregate separate loans in order to make any one usurious loan valid, because the usurious rate of a loan is measured from the date of the loan. *See Sabella v. Scantek Medical, Inc.*, 2009 WL 3233703, *21 (S.D.N.Y. Sept. 25, 2009).

---

[14] In addition, the BVI Judgment resulted in an Order granting Plaintiffs' monetary relief against Seagrape Investors, which is the subject of Plaintiffs' simultaneously filed cross-motion.

Second, assuming, *arguendo*, the amounts the Mullen Investors claim they are entitled to are, in fact, "loans," assessed fees and offsetting stock payments must be considered in the calculation of interest rates.  *See Hillair Cap. Investments, L.P. v. Integrated Freight Corp.*, 963 F. Supp. 2d 336, 339 (S.D.N.Y 2013) (when assessed fees do not actually reimburse lenders for expenses associated with the loan, such fee expenses can be considered in determining the interest rate); *see Lloyd Cap. Corp. v. Pat Henchar, Inc*., 80 N.Y.2d 124, 127 (1992) (acknowledging that fees can sometimes be "a pretext for higher interest"); *see Sabella,* 2009 WL 3233703, at *17– 22  (holding that the value of common stock given to the lender should be taken into account when determining the loan's interest rate).

While discovery is required to determine the exact origin and amounts of funds the Mullen Investors claim to be owed, the *principal* of any single "loan" the Mullen Investors claim to have made is less than $2.5 million, and the excessive penalties and interest rates the Mullen Investors seek to enforce in bad faith are subject to, and precluded by, New York's usury laws.  Further, the exorbitant "fees" at issue, as well as the value of redemptions and stock payment offsets are issues of fact subject to discovery and necessarily preclude dismissal of Plaintiffs' claim at this stage.

It must be noted that the Mullen Investors wholly ignore that portion of Plaintiffs' declaratory judgment claim that seeks a declaration that the Mullen Investors are in a subordinated unsecured position and are therefore not entitled to collect *any* repayment of debt prior to the full satisfaction of GACP's Senior Loan, which has not yet been satisfied.  *See* Amended Compl., ¶¶ 226-227.  Accordingly, any argument to the contrary improperly raised for the first time on reply is therefore waived in its entirety.

For the reasons stated above, the Mullen Investors' motion to dismiss Plaintiffs' request for declaratory judgment must be denied.

## **CONCLUSION**

For all of the reasons explained above, Plaintiffs request that the Court deny Defendants'

motion to dismiss in its entirety, and for such other and further relief as this Court deems just and

proper.

Dated: New York, New York
       November 12, 2019

                                MICHELMAN & ROBINSON, LLP

                                By:    */s/ John Giardino*
                                          John Giardino
                                          Brooke K. Haley
                                          800 Third Avenue, 24th Floor
                                          New York, New York 10022
                                          (212) 730-7700
                                          *Attorneys for Plaintiffs*