USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 9/25/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

OBRA PIA LTD., KIT CAPITAL, LTD.,
OBRA PIA (US) FEEDER, LP, AND
KALEIL ISAZA TUZMAN,

               Plaintiffs,

               v.

SEAGRAPE INVESTORS LLC AND
EDWARD V. MULLEN,

               Defendants.

---

No. 19-CV-7840 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiffs Obra Pia Ltd. ("Obra Pia"), Obra Pia (U.S.) Feeder, LP ("OP Feeder"), KIT Capital, Ltd. ("KIT Capital"), and Kaleil Isaza Tuzman ("Tuzman") bring this action against Defendants Seagrape Investors LLC ("Seagrape") and its principal, Edward Mullen, asserting claims for breach of fiduciary duty, breach of contract, breach of the covenant of good faith and fair dealing, and fraud, as well as for a declaratory judgment as to certain terms contained in the parties' agreements. Now before the Court is Defendants' motion to dismiss the First Amended Complaint and Obra Pia's cross-motion for domestication of a foreign judgment issued in the British Virgin Islands. For the reasons that follow, Defendants' motion is granted, and Plaintiff's cross-motion is denied.

## BACKGROUND

### I.    Factual Background

Unless otherwise noted, the following facts are drawn from Plaintiffs' First Amended Complaint (the "FAC" or "Complaint"), Dkt. 19, and are assumed to be true for the purpose of this motion. *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017).

### A. Convento Obra Pia

The instant dispute arises out of a series of investment agreements related to the development of a luxury hotel project in Cartagena, Colombia, known as "Convento Obra Pia" (the "Development" or the "Project").  *See* FAC ¶ 1.  The Development "involves the historic restoration of the 17th century Obra Pia Franciscan Covent, located in a UNESCO World Heritage zone, to create a 102-room hotel with amenities."  *Id.* ¶ 2.  Obra Pia—a British Virgin Islands ("BVI") company, *id.* ¶ 16 —assembled, through its local branch in Colombia known as Obra Pia Sucursal Colombia, Ltda. ("OP Colombia"), five "separate, adjacent parcels" for the Development.  *See id.* ¶ 3.  These parcels were purchased between 2009 and 2014, and "'Phase 1' restoration of the covenant and construction of the Development was completed between 2014 and 2016."  *Id.* ¶ 4.  Plaintiffs assert that "Obra Pia holds all of the necessary entitlements, construction license and development rights to complete the construction and fit-out of the Development."  *Id.*  According to the Complaint, the Development had been "appraised in excess of [$34 million] on an 'as is'/land appraisal basis and in excess of [$50 million] on a feasibility/discounted cash-flow basis."[1]  *Id.* ¶ 3.

### B. The Parties

As noted, Plaintiff Obra Pia is a company formed under the laws of the BVI.  *See id.* ¶ 16. Plaintiff OP Feeder is a limited partnership also organized under the laws of the BVI, *see id.* ¶ 17, and Plaintiff KIT Capital is a company organized under the laws of Dubai, *see id.* ¶ 19.  Tuzman, an individual, appears to own, manage and/or control the Obra Pia and KIT Capital entities.  *See, e.g.*, FAC Ex. 2 at 9 (Tuzman signs on behalf of himself, Obra Pia, OP Feeder, KIT Capital, and KIT Media); FAC Ex. 3 at 4 (Tuzman signs on behalf of himself, Obra Pia, OP Colombia, OP Manager, and KIT Nevis); FAC Ex. 4 at 5 (Tuzman signs on behalf of OP Feeder).

---

[1] All monetary amounts are in U.S. Dollars unless otherwise specified.

Mullen—on his own and through Seagrape—invested in the Development through a "complicated series of 'investment' and 'credit' agreements beginning in 2013 and continuing through 2016." *See id.* ¶ 7; *see also id.* ¶¶ 5, 11.  At some point during this time, Plaintiff asserts, "Mullen conveyed his equity interests into an entity known as Seagrape Investors, LLC . . . and replaced Seagrape Investors, LLC as a party to the investment agreements." *Id.* ¶ 11.

According to Plaintiffs, Mullen and Tuzman had a "long-standing business and personal relationship." *Id.* ¶ 6.  They assert, for instance, that prior to Mullen's investment in the Development, he—both individually and through his entity Oaktree Partners, LLP ("Oaktree")—invested in companies "related to" Tuzman, such as one known as KIT Media, Ltd. ("KIT Media"). *Id.* ¶ 27. Plaintiffs contend that these prior investments "generated capital proceeds which Mullen and Oaktree [then] elected [to] contribute to KIT Media for purposes of investing in the Development." *Id.* ¶ 28.

**C. Key Agreements Related to the Development**

**1. The Agreements In General**

Mullen and/or Seagrape entered into various agreements with Plaintiffs between 2013 and 2016.  In general, Plaintiffs contend that these agreements "interchanged equity interests and 'credit obligations,'" which "commingl[ed] not only the capital amounts associated with these interests but also the respective rights of the parties as to these investments." *Id.* ¶ 12.  They assert that, pursuant to the various agreements, Defendants "held financial interests as equity interests in the Development," "sought to treat those equity interests as debt," and "subordinated those interests to the rights of" another entity, GACP Cartagena LLC ("GACP" or the "Senior Lender"). *Id.* ¶¶ 13, 97. Plaintiffs maintain further that the parties "understood that the Development would take years to complete and reach operational status." *Id.* ¶ 67.  As such, Mullen allegedly expressed to Tuzman, "both orally and in writing, that he actually viewed his investment as being 'tantamount to equity'

and did not expect [his, or Seagrape's] investment to be redeemed by the respective dates set forth"
in the relevant agreements. *Id.* ¶ 68.

### 2. Investment Agreement

On May 1, 2013, Mullen, Oaktree, Tuzman, and KIT Media entered into the Investment
Agreement. *Id.* ¶¶ 30-31 & FAC Ex. 1 ("Investment Agreement").[2]   Mullen and Oaktree were
identified as "Investors," while KIT Media was listed as the "Recipient" and Tuzman was listed as
the "Guarantor."  FAC ¶ 31.  Pursuant to the Investment Agreement, "Mullen and Oaktree agreed to
convert their prior[] net investment in KIT Media in the amount of $1,885,513 into an investment in
the Development," as well as to "invest additional capital in the amount of $1,850,000."  *Id.* ¶ 30 &
Investment Agreement at 1.  Thus, through this agreement, Mullen invested a total of $3,735,513 in
the Development.  *See* FAC ¶ 35.  As security for his investments, Tuzman agreed to grant Mullen a
first mortgage on two properties—identified as the "Collateral"—in Cannes, France and Park City,
Utah.  *See* Investment Agreement §§ 1.1, 5.1 & FAC ¶ 32.

The Investment Agreement provided for "redemption and return of Mullen's and Oaktree's
investment on or before December 31, 2013" (the "Due Date").   FAC ¶ 33; *see also* Investment
Agreement § 3.1 (providing that the investment amounts "shall be redeemed by [KIT Media] to
[Mullen and Oaktree] in full . . . on or before December 31, 2013," along with a "guaranteed return
on [the $1,885,513 investment]" and a "return based on a 20% share in [KIT Media's] profits" as to
the $1,850,000 investment).  Plaintiffs maintain, however, that the Investment Agreement did not
provide Mullen with any "control over the terms of redemption and/or return on the investment
principal."  FAC ¶ 36.   Rather, Plaintiffs assert, the Investment Agreement makes clear that

---

[2] The Court may consider the exhibits attached to the Complaint.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d
87, 98 (2d Cir. 2007).

"redemption or return of capital investment is controlled solely by the recipient with the sources of funding likely to be either a capital transaction or cashflow from the Development." *Id.* ¶ 37.

In the event of a default under the Investment Agreement, the "sole remedy" for Mullen and Oaktree was "to foreclose upon [their] interest in the collateral securing the investment." *Id.* ¶ 38. Plaintiffs assert that neither Mullen nor Oaktree ever "declared a default under the [] Investment Agreement," nor "took any action with respect to the [C]ollateral." *See id.* ¶¶ 39-40.

The Investment Agreement contains a New York choice-of-law provision, which provides that the Agreement "shall be governed by and construed in all respects in accordance with the laws of the State of New York." Investment Agreement § 11.

### 3. Investment Addendum

On September 19, 2014, the parties entered into an "Addendum to Investment Agreement" (the "Addendum"). *See* FAC ¶ 41 & FAC Ex. 2 ("Addendum"). Pursuant to the Addendum, Seagrape replaced Mullen and Oaktree as the "Investor" and OP Feeder replaced KIT Media as the "Recipient." FAC ¶ 42. Tuzman remained listed as a "Guarantor," although KIT Capital and Obra Pia were also added as "Guarantors." *See id.* The Collateral in Cannes, France and Park City, Utah were replaced with "New Collateral," defined as four properties in Cartagena de Indias, Colombia that Obra Pia owned and that KIT Capital beneficially owned. *See* Addendum §§ 3.1, 3.2 & FAC ¶ 57. The Addendum noted that the Investment Agreement was "incorporated by reference into this Addendum," and provided in particular that "[a]ny terms in the [Investment] Agreement not explicitly changed or overwritten by this Addendum will continue to apply to the business dealings between the Parties." Addendum at 1.

Plaintiffs allege that, at the time of the execution of the Addendum, "Mullen's shares in KIT Media had not been transferred to KIT Capital," as required by the Investment Agreement, FAC ¶ 43,

and that neither Mullen nor Seagrape had contributed any "additional funds to Obra Pia" between the execution of the Investment Agreement and the execution of the Addendum, *see id.* ¶ 44.

The Addendum acknowledged that, in January 2014, KIT Capital had made a "partial redemption" to Seagrape in the amount of $50,000. *See* Addendum at 2 & FAC ¶ 45. Pursuant to the Addendum, OP Feeder "was obligated to redeem from [Seagrape]" (1) the $1,885,513 investment, plus a guaranteed return, for a total redemption of $2,161,492, and (2) the $1,850,000 investment, "plus an additional 20% on [that] amount," for a total redemption of $2,200,000. *See* Addendum at 3 & FAC ¶¶ 46-47. In light of the $50,000 partial redemption, the total "2013 Amount Due" was calculated as $4,331,492. *See* Addendum at 3 & FAC ¶ 49. Defendants thus "claim[ed]" that, as of September 2014, they "were entitled to a redemption in the amount of $4,331,492 . . . which amounts to a $595,979 return, or approximately 16% return[,] on [their] investment over a period of 16 months." FAC ¶ 50. Plaintiffs assert that, between January 2014 and August 2015, "no additional redemption of [Defendants'] principal was made." *Id.* ¶ 59.

The Addendum also acknowledged that, as of September 19, 2014, no default had been declared pursuant to the Investment Agreement. *See* Addendum § 1.2 & FAC ¶ 51. The Investment Agreement's Due Date, moreover, was replaced with March 31, 2015 (the "New Due Date"). *See* Addendum §§ 1.1, 1.2 & FAC ¶ 51. The parties further agreed to a "reasonable preferred return" (the "Delay Preferred Return") to be applied to the 2013 Amount Due of $4,331,492, starting January 1, 2014. *See* Addendum at 3; *see also* Addendum § 1.3 ("The Parties agree that the Delay Preferred Return will be [10%] per annum, compounded monthly."). According to Plaintiffs, applying the Delay Preferred Return to the 2013 Amount Due amounted to a total of $4,656,354—a "$920,841 return, or an approximate 25% return[,] on [Defendants'] $3,735,513 investment a mere 16 months prior." FAC ¶ 53 & Addendum § 1.4.

Pursuant to the Addendum, Seagrape made an "additional capital investment" in OP Feeder in the amount of $343,646 (the "Additional Investment"). *See* Addendum § 2.1 & FAC ¶ 54. The Delay Preferred Return applied to the Additional Investment, but began to accrue only as of October 1, 2014. *See* Addendum § 2.2 & FAC ¶ 54. Under the terms of the Addendum, the parties agreed that, "in order for [OP Feeder] to fulfill its obligation to redeem the 2013 Amount Due and the Additional Investment," plus "any Delay Preferred Return at time of redemption," OP Feeder would —immediately upon execution of the Addendum—issue to Seagrape 500 "Limited Partnership Interests" in OP Feeder (the "Original LP Interests"). *See* Addendum § 2.3 & FAC ¶ 55. The Addendum provided that the Original LP Interests represented an approximately $5 million ownership interest in OP Feeder. *See id.* One hundred of the 500 Original LP Interests were defined as the "Ongoing Investment Interests." *See id.*

The Addendum provided further that, at the time of its execution, the "total redemption amount due" to Seagrape was $4 million (the "Current Amount Due"), which included the Additional Investment but excluded the $1 million worth of Original LP Interests. *See* Addendum § 2.5 & FAC ¶ 56.

### 4. GACP Letter of Interest

In mid-2016, "as a result of [certain] pressure asserted by Mullen," the parties to the Addendum—i.e., Mullen, Seagrape, KIT Media, OP Feeder, Tuzman, KIT Capital, and Obra Pia— "agreed to pursue a third-party purchase of the yet-to-be-completed Development." FAC ¶ 69. The parties allegedly "further agreed that proceeds from a third-party sale would be used to pay off the Development's creditors, including [Mullen and Seagrape], with any residual proceeds to be paid to the Obra Pia entities." *Id.* ¶ 70. Accordingly, "with [Defendants'] knowledge and consent," the Obra Pia entities "sought a buyer for the Development." *Id.* ¶ 71.

7

On August 23, 2016, an entity known as GACP Latin America Partners, LLC ("GACP LA"), a "GACP-affiliate," entered into a "letter of intent to purchase a majority of the Development" (the "August 2016 LOI").  *Id.* ¶ 72.  According to Plaintiffs, the August 2016 LOI gave GACP LA "the exclusive right to purchase control of the Development," based on a "total valuation of the Development" at $50.2 million.  *Id.* ¶ 73.  GACP LA would thereby "purchase the Obra Pia entities' interest in the Development, and pay off the Development's creditors, including [Defendants]."  *Id.* ¶ 74.  GACP LA's "exclusivity period" initially lasted through October 7, 2016, but was later extended through November 30, 2016.  *See id.* ¶¶ 75-76.  Plaintiffs allege that Defendants "were aware of, and consented to, the August 2016 LOI."  *Id.* ¶ 78.  Plaintiffs assert further that, through August 2016, Defendants "took no action to enforce what, if any, rights they had with respect to any default under the [] Addendum."  *Id.* ¶ 77.

### 5.   Credit and Security Acknowledgement

On August 25, 2016, Tuzman, Obra Pia, OP Colombia, Obra Pia Management, GP ("OP Manager"), and KIT Capital (Nevis) LLC ("KIT Nevis") entered into a Credit and Security Acknowledgement (the "CSA") with Seagrape.  *See* FAC ¶ 79 & FAC Ex. 3 ("CSA").  In the CSA, Tuzman, Obra Pia, OP Colombia, OP Manager, and KIT Nevis were collectively identified as the "Debtors."  *See* CSA at 1 & FAC ¶ 82.  Plaintiffs assert, however, that neither Mullen nor Seagrape was "identified as creditors or lenders in the CSA documents."  *See* FAC ¶ 81.  Plaintiffs allege that the CSA, together with the August 2016 LOI, was "intended by the participating parties to be part of an overall transaction for financing and selling the Development."  *Id.* ¶ 80.

The CSA expressly provided that the Addendum, executed on September 19, 2014, and the Investment Agreement, executed on April 30, 2013,[3] were "ratified and confirmed in their entirety,

---

[3] Although the CSA states that the Investment Agreement was "executed between a number of the Parties on April 30, 2013," *see* CSA § 4, the "Execution Date" of the Investment Agreement is May 1, 2013, *see* Investment Agreement at 1.

except as superseded or modified by [the CSA]." CSA § 4. The CSA referred to the Investment Agreement and the Addendum together as the "Previous Agreements." *Id.* The CSA provided, moreover, that "any contradiction between the Previous Agreements, on the one hand, and [the CSA], on the other, shall be resolved in favor of [the CSA]." CSA § 9.

The CSA provided that Seagrape was "owed by the Debtors related to funds lent and invested, and penalties and interest levied, by Seagrape and related parties over time . . . in the [Development]." CSA § 1. The parties acknowledged in the CSA that the Debtors had "not repaid all of the funds lent by Seagrape when due" pursuant to the Previous Agreements. *See* CSA § 2. The CSA thus provided that, as of July 31, 2016, Seagrape was due $4,694,806 (the "Cash Amount Due"), which was to accrue interest from August 1, 2016 at the rate of 15% per annum "or the maximum rate allowed by applicable law." CSA § 2 & FAC ¶¶ 83-84. The CSA provided further that Seagrape was "entitled to a total of 237.5 LP Interests" in OP Feeder, "as a result of its original investment and certain Penalty LP Interests." CSA § 2 & FAC ¶ 85. According to the CSA, Seagrape's 237.5 "beneficially-owned LP Interests" had a "conversion rate," as of July 31, 2016, of $2,882,018. CSA § 2 & FAC ¶ 87.

Pursuant to the CSA, the Debtors agreed to be "jointly and severally obligated to pay Seagrape the Cash Amount Due," plus interest, by January 2, 2017 (the "Foreclosure Date"). CSA § 10 & FAC ¶ 90. Seagrape, in turn, agreed "not to foreclose" on the "Secured Assets"—defined in the CSA as the "real-estate security for the Cash Amount Due," which consisted of "the Personal Guarantee" defined in Investment Agreement § 5.6 "for the Guaranteed Balance" and the properties defined as "New Collateral" in the Addendum, *see* CSA § 5—or on "any other collateral" until the Foreclosure Date had passed, "as long as all Debtors completely fulfill their obligations under [the CSA]." CSA § 11 & FAC ¶ 91. The parties also agreed that, in the event that either Debtors or "a third-party on behalf of Debtors" paid Seagrape at least $1 million by January 2, 2017, the Foreclosure Date of January 2, 2017 would be "extended to March 31, 2017." CSA § 11 & FAC ¶ 92. Moreover, the

parties agreed that, if a partial payment of at least $1 million was made to Seagrape by January 2, 2017, that payment would "constitute an obligation senior to the remainder of Seagrape's Cash Amount Due, and shall be paid by the Debtors prior to Seagrape's receiving any additional funds." CSA § 11 & FAC ¶ 93.  According to the Complaint, prior to October 31, 2016, GACP LA wired $1 million directly to Defendants "to reduce the obligation owed by the Obra Pia entities to [them]," FAC ¶ 94, and Defendants "acknowledged receipt" of the $1 million payment "in reduction [of] the amount [they were] owed by the Obra Pia entities," *id.* ¶ 95.  As a result of the $1 million payment, the Foreclosure Date was thus extended to March 31, 2017.  *See id.* ¶ 96.

Pursuant to § 11 of the CSA, the Debtors also agreed to "fully cooperate to facilitate Seagrape's foreclosing on the property and [] not [to] block such foreclosure or cooperate with anyone seeking to block it."  CSA § 11.  In turn, Seagrape agreed to "exercise best efforts to support Debtors' sale of all or a portion of the Project that would result in repayment of the Cash Amount Due," and not to, in any event, "do anything to block such a sale."  *Id.*

The CSA contains a New York choice-of-law provision, providing that it "shall be governed by the laws of the State of New York . . . without regard to its rules of conflicts of law."  CSA § 12.

### 6. Subordination Agreement

On October 14, 2016, GACP, Seagrape, OP Feeder, Obra Pia (Non-U.S.) Feeder, KIT Capital,[4] and Obra Pia entered into the Subordination Agreement.  FAC ¶ 97 & FAC Ex. 4 ("Subordination Agreement").  As the "holder[] of the Senior Loan," GACP was identified as the "Senior Lender." FAC ¶ 97 & Subordination Agreement at 1.  Seagrape, OP Feeder, Obra Pia (Non-U.S.) Feeder, and KIT Capital were each identified as a "Subordinated Lender," and Obra Pia was identified as the "Borrower."  *Id.*

---

[4] The Court assumes that "KIT Capital, LLC"—a party to the Subordination Agreement—is the same entity as Plaintiff KIT Capital, Ltd. as Plaintiffs refer to both as "KIT Capital."

The Subordination Agreement provided that Obra Pia would execute and deliver to GACP a "Secured Promissory Note" in the amount of $1.5 million (the "Senior Loan").  *See* Subordination Agreement, Recital 2.  It provided further that, of the $1.5 million "being advanced by [GACP] pursuant to the Senior Loan Documents," $1 million "shall be immediately paid to Seagrape and credited against the Subordinated Loans made by Seagrape to or for the benefit of [Obra Pia]."  *See* Subordination Agreement, Recital 3.  Accordingly, pursuant to § 1(a), the $1.5 million payment "contemplated by the Senior Loan Documents" was divided into a $500,000 payment to Obra Pia and a $1 million payment to Seagrape.[5]  Subordination Agreement § 1(a).  The parties expressly agreed that "all debt owed by [Obra Pia] to any of the Subordinated Lenders"—i.e., Seagrape, OP Feeder, Obra Pia (Non-U.S.) Feeder, and KIT Capital—"is and shall be subordinate and junior in right of payment to the prior payment in full of the Senior Loan and the obligations under the Senior Loan Documents, . . . and that the subordination is for the benefit and enforceable by [GACP]."  Subordination Agreement § 1(a) & FAC ¶ 99.  In the Subordination Agreement, each Subordinated Lender also specifically represented that "[t]he amounts due to the Subordinated Lender by [Obra Pia] are either (a) unsecured or (b) such security interest has not been perfected" "at all times until all Senior Debt has been paid."  Subordination Agreement § 5(f).  The Subordinated Lenders, including Seagrape, agreed further that they would not "declare a default with respect to any Subordinated Loan or exercise any rights with respect to any collateral securing the Subordinated Loans without providing [GACP] at least three [] months advanced notice."  Subordination Agreement § 1(a) & FAC ¶ 100.

Pursuant to § 2 of the Subordination Agreement, the parties agreed that, if, "during the continuation of an event of default of which [the] Subordinated Lenders have received written notice,

---

[5] The $500,000 payment to Obra Pia was apparently "set aside for Development-specific expenses."  FAC ¶ 101.

a payment or distribution is made to any Subordinated Lender that because of [the Subordination Agreement] should not have been made to them, such Subordinated Lender who receives the distribution shall hold it in trust for [GACP] . . . and pay it over to [GACP]."  Subordination § 2 & FAC ¶ 102.  The Subordination Agreement also confirmed the Foreclosure Date of March 31, 2017. *See* Subordination Agreement § 1(b) & FAC ¶ 103.

The Subordination Agreement contains a New York choice-of-law provision, providing that the Agreement, "and all disputes or controversies arising out of or relating to [the Subordination Agreement] or the transactions contemplated hereby[,] shall be governed by, and construed in accordance with, the laws of the State of New York."  Subordination Agreement § 12.

### 7.  Amendments to GACP Letter of Interest

On December 5, 2016, GACP LA's August 2016 LOI was amended.  *See* FAC ¶ 104.  Pursuant to this first amendment, "the Development was assigned a total valuation of $43.9 million," and GACP agreed to "pay off all of the Development's creditors and outside investors, including the 'debt' owed to [Defendants]," and to "purchase the majority of the equity in the Development, with an Obra Pia entity retaining any residual portion of the equity."  *Id.* ¶ 105.

In early 2017, however, GACP LA allegedly "advised [that] it needed additional time to obtain the necessary financing, consummate its purchase of the equity in the Obra Pia entities, repay the Oba Pia entities' creditors and outside investors (including Seagrape []), and complete the Development." *Id.* ¶ 108.  Following GACP LA's request for an "independent appraisal of the Development's value 'as is,'" on approximately February 27, 2017, an independent Colombian real estate appraisal firm —Enith Barrios & Associates—"appraised the five real estate parcels that comprise the Development 'as is' at approximately" $34.5 million.  *See id.* ¶¶ 106-07.  According to the Complaint, on April 30, 2017, GACP LA also "lent an additional $240,000 for the Development's ongoing operations and maintenance, including real estate tax bills."  *Id.* ¶ 109.

On August 1, 2017, the August 2016 LOI was amended for a second time. *See id.* ¶ 110. This second amendment "memorialized that the $1.5 million lent by GACP in October 2016 remained Senior Debt and [that] the Subordination Agreement remained in effect." *Id.* ¶ 112. GACP LA also agreed to "lend an additional $145,000 for the Development's ongoing operational costs, including real estate tax bills." *Id.* ¶ 111. Additionally, the second amendment provided for an "extension of time for [GACP LA] to consummate the transaction." *Id.*

Finally, on November 6, 2017, the August 2016 LOI was amended for a third time. *See id.* ¶ 113. With Defendants' consent, this third amendment apparently extended GACP LA's period of exclusivity to December 31, 2017, and provided GACP LA with the option to extend that period further to March 31, 2018 "if GACP loaned Obra Pia an additional $132,000 for operational costs." *Id.* ¶ 114. In general, Plaintiffs allege that Defendants "were aware of, and consented to," the amendments to the August 2016 LOI. *Id.* ¶ 78.

### D. Tuzman's Indictment

In approximately August 2015, Tuzman was indicted in the Southern District of New York in connection with charges relating to "a completely unrelated software business that ceased doing business in 2012." *Id.* ¶ 60. In July 2016, Tuzman was arraigned in the U.S. District Court for the Southern District of New York, and was subsequently "released, with travel restrictions, based upon his posting of adequate security, as well as a personal-recognizance bond," or "PBR," which was "signed by eight individuals, including Mullen." *Id.* ¶ 61. Plaintiffs maintain that the PBR was "significant" because it allowed Tuzman "to continue to devote professional efforts to the Development." *Id.* ¶ 62. Nonetheless, Plaintiffs allege, in August 2017, "Mullen sought to withdraw his signature [on the PBR] in order to cause a revocation of the bond." *Id.* ¶ 63. Plaintiffs assert further that Mullen was "fully aware that the removal of his signature" from the PBR "would have

severe consequences" for Tuzman, and that Mullen sought to do so "in order to gain leverage against [] Tuzman and other Obra Pia entities in connection with the Development." *Id.* ¶ 64.

### E.  Defendants' Alleged Misconduct

Plaintiffs allege that, from 2013 to 2016, "Mullen, through one device or another, tried to have his invested capital redeemed and paid over to him." *Id.* ¶ 8.  But, Plaintiffs contend, "as a development project, the sources of such redemption or payment [were] either cashflow from the completed Development or a capital transaction including a sale of some or all of the assets of the Development." *Id.* ¶ 9.  They assert  further that, because Obra Pia was unable to "redeem Mullen's equity interest" at the time, "Mullen resorted to various tactics to leverage or force a repayment in violation of his fiduciary duties." *Id.* ¶ 10.  In particular, Mullen allegedly "took personal action" against Tuzman in order to "leverage repayment in the absence of a redemption," filed "complaints in the nature of involuntary bankruptcy petitions against Obra Pia," and filed "a nefarious demand for payment and liquidation of Obra Pia in the British Virgin Islands." *Id.* ¶ 14.  During "this course of wrongful conduct," Defendants ostensibly "held themselves out as both investors in, and creditors of, the Development." *Id.* ¶ 15.  Plaintiffs allege that they did so "depending upon which classification was most advantageous to them at any given time, in order to advance their own interests to the detriment of Plaintiffs and the Development." *Id.*

### F.  Notice of Default

Plaintiffs contend that, on April 27, 2017, Defendants' counsel notified GACP, pursuant to § 1(a) of the Subordination Agreement, that Defendants intended "to declare a default by, among other parties, Borrower under [Defendants'] Subordinated Loans and otherwise exercise any and all rights and remedies with respect to any collateral securing said Seagrape Subordinated Loans (which may include, without limitation, the filing of a foreclosure action in Colombia[)]." *Id.* ¶ 115.  Plaintiffs allege that, at the time of this "notice of default," GACP was "still in its exclusivity period to

14

consummate its intention to purchase the Development," and that such consummation "would have resulted in [Defendants] being paid in full." *Id.* ¶ 116.   According to Plaintiffs, Defendants nonetheless "did not pursue foreclosure against any secured collateral in Colombia." *Id.* ¶ 117. Plaintiffs maintain that Defendants did not do so "presumably because the Subordination Agreement expressly prohibited them from" taking such action. *See id.*

### G. SDS Complaints

Plaintiffs assert that, on November 6, 2017, Defendants instead filed a complaint with the Colombian Superintendencia de Sociedades (the "SDS"), which is a supervisory body "akin to the United States Securities and Exchange Commission." *Id.* ¶ 118.   In the first SDS Complaint, Defendants alleged that "the Obra Pia entities had defaulted in payment obligations" owed to Defendants, as well as to an architectural firm named Barrera & Barrera. *See id.*  Defendants did not seek any relief "for other investors or creditors in the Development besides themselves and Barrera & Barrera." *Id.* ¶ 127.   Through the SDS Complaint, Defendants sought "liquidation of [OP Colombia]"—an action which Plaintiffs allege was "tantamount to a request for liquidation of Obra Pia [itself], as all five of the Development's land/building parcels and all of the Development's entitlements and construction licenses were held by [OP Colombia]." *Id.* ¶ 118.  Plaintiffs maintain further that Defendants failed to disclose to the SDS that they were "in fact, subordinate to GACP (pursuant to the CSA) and *pari passu* with other creditors and LP investors in [OP Feeder]." *Id.* ¶ 128.

According to Plaintiffs, a "legal predicate of filing a request for liquidation with the SDS" is the "presence of two allegedly overdue and unpaid creditors." *Id.* ¶ 120.  They assert that Barrera & Barrera was "*not* an overdue and unpaid creditor of [OP Colombia]" at the time Defendants filed the first SDS Complaint, but that Defendants nevertheless "induced Barrera & Barrera to join in the first SDS complaint under false pretenses." *Id.* ¶¶ 121-22.  They allege further that, at all relevant times,

Defendants were in fact "aware that Barrera & Barrera was *not* an overdue and unpaid creditor of the Obra Pia entities." *Id.* ¶ 123.

On approximately November 27, 2017, Barrera & Barrera allegedly withdrew its participation in the first SDS Complaint by "writing to the SDS," stating that "it had been improperly induced by [Defendants] to participate in the liquidation request" and that "it was not an overdue and unpaid creditor." *Id.* ¶ 124.  Plaintiffs contend that, at the time of Barrera & Barrera's withdrawal, however, "the SDS had already opened an inquiry," *id.* ¶ 125, and that "once an SDS inquiry commences, the company in question is put under SDS supervision," which apparently "cannot be lifted through the withdrawal of one, or even both, creditors," and instead ends only when the "formal SDS inquiry and review process" is complete, *see id.* ¶ 126.  Thus, Plaintiffs maintain, as a result of Defendants' filing of the first SDS Complaint, "the SDS put the Obra Pia entities under 'supervision,'" which "had the effect of creating a government lien on the Development, significantly impairing the Obra Pia entities' ability to take any material actions regarding the sale or refinancing of the Development, freezing the ability of the Development to take any material action without complicated SDS reviews and approvals, and significantly tarnishing the business reputation of the Development." *Id.* ¶ 129.  They assert further that the filing of the first SDS Complaint also "chill[ed] the market, as Colombian SDS-supervised sales have historically been associated with drug-related crime and asset seizure." *Id.* ¶ 130.  Moreover, following Defendants' filing of the first SDS Complaint, GACP LA allegedly "failed to exercise its right to extend the exclusivity period beyond December 31, 2017, thereby withdrawing from its expressed intent (for over a year) to purchase the Development." *Id.* ¶ 132.

On October 18, 2018, Defendants filed a second SDS Complaint, alleging that they were "owed $4,694,806," and—according to Plaintiffs—"making spurious and inflammatory false claims and misrepresent[ing] their right to receive payment." *Id.* ¶¶ 133-34.

Plaintiffs allege that Defendants filed the SDS Complaints in order to "circumvent the terms of the Subordination Agreement, which expressly prohibited payment of [their] subordinated debt until GACP's Senior Loan was fully repaid," *id.* ¶ 135, as well as to "advance [their] interest in front of creditors that were either senior to or *pari passu* to [them]," such as GACP, "and/or to seek assignment of the Development by the SDS," *id.* ¶ 136.  Plaintiffs contend that the filing of these Complaints, which purportedly contained "false allegations," "directly resulted in the reduction of the sale value of the Development."  *Id.* ¶ 137.  In particular, Plaintiffs allege that at least two other entities entered into letters of intent with the Obra Pia entities for a contemplated sale of the Development, but that neither sale ultimately consummated, "in large part due to the SDS supervisory status."  *See id.* ¶¶ 138-39.  Overall, Plaintiffs assert, the SDS supervision "impaired the value of [OP Colombia's] assets and the prospect of a sale or refinancing of the Development."  *Id.* ¶ 142.  At the end of its investigation, however, the SDS apparently "uncovered no evidence of the wrongdoing of which [Defendants] complained in [their] complaints to the SDS," *id.* ¶ 143, and instead, "entirely refuted [Defendants'] claims that Obra Pia was insolvent and mismanaged," *id.* ¶ 144.

### H.  BVI Statutory Demand[6]

On January 21, 2019, Defendants served a "Statutory Demand" under Section 155 of the BVI Insolvency Act 2003, seeking dissolution of Obra Pia.  *See id.* ¶¶ 145-46.  Plaintiffs allege that, in particular, the Statutory Demand sought dissolution of Obra Pia "based on the false claim that [Defendants] were owed $5,099,917.49" as a result of Obra Pia's "guarantee" under the Investment Agreement, the Addendum, and the CSA, "each of which were superseded by the Subordination Agreement."  *Id.* ¶ 147.  On February 4, 2019, Obra Pia made an application to the BVI Court to set

---

[6] Because the Complaint does not include factual details about the proceedings in the BVI Court, aside from the allegations that Defendants served a Statutory Demand and the BVI Court issued a judgment, and because such facts are relevant to Obra Pia's cross-motion, the Court includes them here—and draws upon the exhibits attached to the Declaration of John Giardino filed in support of the cross-motion—only for the purpose of that motion.

aside the Statutory Demand, arguing that it had a "reasonable prospect of establishing a set-off, counterclaim or cross claim against [Seagrape] in an amount greater than the amount specified in the statutory demand." *See* Giardino Decl. Ex. 2 at 2.

In a judgment dated May 22, 2019, the BVI Court set aside the Statutory Demand and directed Obra Pia to "commence a New York action within 30 days from the date of this judgment unless the parties settle the matter in the meantime." FAC ¶ 148 (internal quotation marks omitted). Additionally, in an order dated May 23, 2019, and entered May 31, 2019, the BVI Court ordered Seagrape to pay Obra Pia's costs in bringing its application to set aside the Statutory Demand— specifically, in the amount of $40,200—by June 6, 2019, *see* Giardino Decl. Ex. 6 at 1, which Plaintiffs contend Seagrape did not do, *see* Giardino Decl. ¶ 18.

## II.    Procedural Background

In light of the BVI Court's judgment, Plaintiffs commenced this action in the Supreme Court of New York on June 24, 2019. FAC ¶¶ 23, 149. On August 21, 2019, Defendants removed the action to this Court on diversity jurisdiction grounds. *Id.* ¶ 24. Plaintiffs filed the First Amended Complaint—the operative complaint—on September 18, 2019. Dkt. 19. On October 9, 2019, Defendants moved to dismiss the First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. 25. Plaintiffs filed their opposition on November 13, 2019, Dkt. 36, and Defendants replied on December 6, 2019, Dkt. 47. Separately, on November 12, 2019, Obra Pia filed a cross-motion "for domestication of foreign judgment," Dkt. 33, to which Defendants filed an opposition on November 26, 2019, Dkt. 44, and Obra Pia filed a reply on December 3, 2019, Dkt. 46. On August 27, 2020, the Court received supplemental letter briefs from the parties regarding whether the law of New York or the law of the British Virgin Islands applies to the claims in this case. *See* Dkt. 81 (Defs. Supp. Ltr.); Dkt. 82 (Pls. Supp. Ltr.).

**LEGAL STANDARD**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). On a Rule 12(b)(6) motion, the question is "not whether [the plaintiff] will ultimately prevail," but "whether [the] complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 529–30 (2011) (citation omitted). In answering this question, the Court must "accept[] all factual allegations as true, but 'giv[e] no effect to legal conclusions couched as factual allegations.'" *Stadnick*, 861 F.3d at 35 (quoting *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010)). Moreover, on a motion to dismiss, a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns*, 493 F.3d at 98.

**DISCUSSION**

**I.      Plaintiffs' Breach of Fiduciary Duty Claims**

Plaintiffs first assert two breach of fiduciary duty claims, one based on Defendants' status as "equity partners" and "joint venturers," and the other based on their status as "lenders" or "creditors."

**A.  Choice of Law**

As a preliminary matter, Defendants assert that BVI law applies to Plaintiffs' first cause of action only—for breach of fiduciary duty based on Defendants' status as equity partners or "joint

venturers." *See* Mot. at 20.[7]  In particular, Defendants contend that "[u]nder well-established choice-of-law rules, questions relating to the internal affairs of a business entity are decided in accordance with the law of the place of incorporation," including with respect to "claims between and among owners for breach of fiduciary duty."  *See id.*  It is true that the internal affairs doctrine "recognizes that only one State should have the authority to regulate a corporation's internal affairs—*matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders*—because otherwise a corporation could be faced with conflicting demands."  *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 427 (S.D.N.Y. 2006) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982)) (emphasis added).  Nonetheless, the Court finds that the internal affairs doctrine is not applicable here.

Defendants argue that BVI law "governs the rights and obligations of the general and limited partners of OP Feeder," Reply at 2, because "Seagrape's rights as a limited partner arise under the Limited Partnership Agreement of OP Feeder, which is a creature of BVI Law," *id.* at 8.  But Plaintiff's breach of fiduciary duty claim is not brought under OP Feeder's Limited Partnership Agreement—an agreement that was not attached to the Complaint, is not incorporated into the Complaint by reference, and on which the Court cannot conclude, without more, is "integral" to the Complaint.[8]  *See ATSI Commc'ns*, 493 F.3d at 98; *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002).  To the contrary, Plaintiffs' first cause of action is brought against Defendants as

---

[7] As to the remaining claims, the parties agree that New York law applies.  *See* Defs. Supp. Ltr.; Pls. Supp. Ltr.  Indeed, they assumed as much in their motion papers, which is sufficient to determine that New York law applies to these claims. *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (explaining that where the "parties' briefs assume that New York law controls, [] such implied consent . . . is sufficient to establish choice of law") (internal quotation marks and citation omitted); *19 Recordings Ltd. v. Sony Music Entm't*, 97 F. Supp. 3d 433, 438 n.4 (S.D.N.Y. 2015) ("In their briefing, the parties [] assume that New York law applies, which is itself sufficient to determine the choice of law.").

[8] While Defendants attached a copy of the OP Feeder Limited Partnership Agreement to their reply brief, *see* Dkt. 48-1, their doing so does not change the Court's analysis.  The OP Feeder Limited Partnership Agreement is not mentioned in the Complaint.  Nor does it appear that Plaintiffs relied on that agreement in particular—as opposed to agreements such as the Addendum and the CSA—in bringing this action.

"equity holders in the Development" and as "limited partners in Obra Pia."[9]  *See* FAC ¶ 151.  Nor are "matters peculiar to the relationships among or between [OP Feeder] and its current officers, directors, and shareholders," *Drenis*, 452 F. Supp. 2d at 427, involved in this claim.  Rather, this cause of action invokes the various agreements into which the parties entered, such as the CSA, *see id.* ¶ 156, and the Subordination Agreement, *see id.* ¶ 160.[10]  In fact, Defendants acknowledge that the CSA and the Addendum, at a minimum, "make reference to Seagrape's Limited Partnership Units in OP Feeder," but nonetheless argue—without pointing to any document at issue in this action—that "under the internal affairs doctrine, Seagrape's internal rights and obligations as a limited partner of OP Feeder are governed by BVI law."  *See* Reply at 8.

The agreements that give rise to this action all contain New York choice-of-law provisions.  *See also* Opp'n at 22 (arguing that Defendants' "equity interest in Obra Pia arises from the 2013 Investment Agreement, the 2014 Addendum, and the CSA, each of which are governed by New York law").  "New York recognizes the right of contracting parties to agree to the choice of law."  *See Drenis*, 452 F. Supp. 2d at 425; *see also 19 Recordings*, 97 F. Supp. 3d at 438 ("Here, the choice of law question is resolved by reference to the Licensing Agreement, which contains a clear choice of law provision selecting New York law.").  "[I]n order for a choice-of-law provision to apply to claims for tort arising incident to the contract, the express language of the provision must be 'sufficiently broad' as to encompass the entire relationship between the contracting parties."  *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) (quoting *Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 309-10 (2d Cir. 1994)).  On the other hand, "tort claims are outside the scope of a choice-of-law provision when the provision only specifies what law governs construction of the terms of the agreement."

---

[9] In the Complaint, "Obra Pia" refers collectively to all four plaintiffs.  *See* FAC at 1

[10] Although paragraph 160 references the "Subscription Agreement," the Court assumes it should say "Subordination Agreement" as the Complaint contains no factual allegations about any "*Subscription* Agreement."

*Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 411 (S.D.N.Y. 2010).   Here, the choice-of-law provisions contained in CSA and the  Subordination Agreement, for instance, are "sufficiently broad" so as to encompass Plaintiffs' breach of fiduciary duty claim.   The CSA provides that it "shall be governed by the laws of the State of New York . . . without regard to its rules of conflicts of law," and the parties also consented to certain jurisdictional agreements and waivers "[w]ith respect to any dispute, controversy, or claim relating to, connected with or arising out of this Agreement."  *See* CSA § 12; *see also* CSA § 4 (defining the Investment Agreement and the Addendum together as the "Previous Agreements," and providing that those agreements are "ratified and confirmed in their entirety, except as superseded or modified by this Agreement"); CSA § 9 (providing that "any contradiction between the Previous Agreements, on the one hand, and this Agreement, on the other, shall be resolved in favor of this Agreement").   The Subordination Agreement similarly contains a broad choice-of-law provision, providing that the Agreement, "and all disputes or controversies arising out of or relating to [the Subordination Agreement] or the transactions contemplated hereby[,] shall be governed by, and construed in accordance with, the laws of the State of New York." Subordination Agreement § 12.   Accordingly, the parties agreed that any disputes arising out of the Agreements were to be governed by New York law, and New York law thus applies to Plaintiffs' breach of fiduciary duty claims.  *See, e.g.*, *Turtur*, 26 F.3d at 309 (provision that parties consented to jurisdiction of New York courts "to resolve any controversy or claim arising out of or relating to this contract or breach thereof" was "sufficiently broad" to cover tort claims arising from the contractual relationship).

## B.  Breach of Fiduciary Duty as Equity Partner (Count I)

"To state a claim for breach of fiduciary duty under New York law, a plaintiff must allege '(1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct.'"  *Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F.

Supp. 3d 191, 206 (S.D.N.Y. 2014) (quoting *Varveris v. Zacharakos*, 110 A.D.3d 1059, 1059 (2d Dep't 2013)).

As to the first prong, "[a] fiduciary relationship exists under New York law when one person is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Boccardi Capital Sys., Inc. v. D.E. Shaw Laminar Portfolios, L.L.C.*, 355 F. App'x 516, 519 (2d Cir. 2009) (quoting *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 599 (2d Cir. 1991)) (alteration omitted). "In determining whether a fiduciary duty exists, the focus is on whether one person has reposed 'trust or confidence in another' and whether the second person accepts the trust and confidence and 'thereby gains a resulting superiority or influence over the first.'" *Indep. Asset Mgmt. LLC v. Zanger*, 538 F. Supp. 2d 704, 709 (S.D.N.Y. 2008) (quoting *Regions Bank v. Wieder & Mastroianni, P.C.*, 423 F. Supp. 2d 265, 270 (S.D.N.Y. 2006)); *see also Grewal v. Cuneo*, No. 13-CV-6836 RA, 2015 WL 4103660, at *11 (S.D.N.Y. July 7, 2015), *aff'd sub nom. Grewal v. Cuneo Gilbert & LaDuca LLP*, 803 F. App'x 457 (2d Cir. 2020) ("Under New York law, breach of fiduciary duty is a tort that arises from a violation of a relationship of trust and confidence.") (alteration, internal quotation marks, and citation omitted); *Kidz Cloz, Inc. v. Officially For Kids, Inc.*, No. 00 Civ. 6270 (DC), 2002 WL 392291, at *4 (S.D.N.Y. Mar. 13, 2002) ("New York courts typically focus on whether one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence over the first.") (citation omitted). Moreover, in order "to survive a motion to dismiss a claim for breach of fiduciary duty, the plaintiff must set forth specific facts constituting the alleged relationship with sufficient particularity to enable the court to determine whether, if true, such facts could give rise to a fiduciary relationship." *Poon v. Roomorama, LLC*, No. 09 Civ. 3224 (RMB), 2009 WL 3762115, at *3 (S.D.N.Y. Nov. 10, 2009) (quoting *World Wrestling Entm't, Inc. v. Jakks Pacific, Inc.*, 530 F. Supp. 2d 486, 504 (S.D.N.Y. 2007)).

"Whether two parties engaged in business together share a fiduciary relationship depends on the nature and quality of that relationship." *Kidz Cloz*, 2002 WL 392291, at *4. Generally speaking, "a conventional business relationship does not create a fiduciary relationship in the absence of additional factors." *Stadt v. Fox News Network LLC*, 719 F. Supp. 2d 312, 319 (S.D.N.Y. 2010) (internal quotation marks and citation omitted). This is particularly so where the parties to a commercial transaction deal at arms-length. *See Boccardi Capital*, 355 F. App'x at 519 ("[W]hen parties deal at arm's length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances.") (alteration and citation omitted); *Dopp v. Teachers Ins. & Annuity Ass'n of Am.*, No. 91 Civ. 1494, 1993 WL 404076, at *5 (S.D.N.Y. Oct. 1, 1993) ("The arm's-length relationship of parties in a business transaction is, if anything, antithetical to the notion that either would owe a fiduciary relationship to the other.").

That said, it is well established that joint venturers owe one another fiduciary duties. *See, e.g.*, *Slip-N-Slide Records, Inc. v. Island Def Jam Music Grp.*, No. 13-CV-04450 (ALC), 2014 WL 2119857, at *2 (S.D.N.Y. May 21, 2014) ("Under New York law, participants in a joint venture owe one another fiduciary duties of loyalty, to act in the best interests of and in good faith toward one another."). Indeed, "[a] joint venture, once formed, operates 'in a sense [as] a partnership for a limited purpose,'" *Fisher v. Tice*, No. 15-CV-955 (LAK) (DF), 2016 WL 4626205, at *12 (S.D.N.Y. July 5, 2016), *report and recommendation adopted,* No. 15-CV-0955 (LAK), 2016 WL 4719759 (S.D.N.Y. Sept. 8, 2016), *aff'd,* 692 F. App'x 54 (2d Cir. 2017), and "[i]t is well established that partners owe fiduciary duties to co-partners," *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 114 (S.D.N.Y. 2009); *see also Itel Containers Int'l Corp. v. Atlanttrafik Express Serv., Ltd.*, 909 F.2d 698, 701 (2d Cir. 1990) ("[A] joint venture 'is in a sense a partnership for a limited purpose, and it has long been recognized that the legal consequences of a joint venture are equivalent to those of a partnership.'") (quoting

*Gramercy Equities v. Dumont*, 72 N.Y.2d 560, 565 (1988)).  "Accordingly, in addition to having a contractual core, a joint venture creates a fiduciary relationship among the joint venturers."  *Fisher*, 2016 WL 4626205, at *12.

Plaintiffs do not, however, actually plead that they were in a partnership or joint venture with Defendants.  *Cf. Kidz Cloz*, 2002 WL 392291, at *5 ("Because co-venturers and partners share a fiduciary duty to one another, plaintiffs' allegation of a partnership or joint venture sufficiently establishes the existence of a fiduciary relationship between the parties.").  To the extent that Plaintiffs' first cause of action is based on Defendants' status as "partners" or "joint venturers" with Plaintiffs—in furtherance of the Development or otherwise—"the Court must first determine whether Plaintiff[s] adequately pleaded a joint venture in the complaint."  *Zeising v. Kelly*, 152 F. Supp. 2d 335, 347 (S.D.N.Y. 2001).  A joint venture exists where "(a) two or more persons enter into an agreement to carry on a venture for profit; (b) the agreement evinces their intent to be joint venturers; (c) each contributes property, financing, skill, knowledge, or effort; (d) each has some degree of joint control over the venture; and (e) provision is made for the sharing of both profits and losses."  *SCS Commc'ns, Inc. v. Herrick Co., Inc.*, 360 F.3d 329, 341 (2d. Cir. 2004).  "At the motion to dismiss stage, the absence of any one of these elements is fatal to the establishment of a joint venture."  *Goureau v. Goureau*, No. 12 Civ. 6443 (PAE), 2013 WL 417353, at *4 (S.D.N.Y. Feb. 4, 2013) (alterations, internal quotation marks, and citation omitted).

Although Plaintiffs allege generally that the underlying purpose of the relevant agreements— the Investment Agreement, Addendum, CSA, and Subordination Agreement—was to finance and develop the Development, they do not allege, among other things, that Seagrape or Mullen entered into any of these agreements "to carry on a venture for profit," that both Plaintiffs and Defendants "each [have] some degree of joint control over the venture," or that a "provision [] made for the sharing of both profits and losses" exists.  Indeed, "[p]arties can evince their intent to be joined as

joint venturers expressly through language in an agreement or impliedly through actions and conduct." *Cosy Goose Hellas v. Cosy Goose USA, Ltd.*, 581 F. Supp. 2d 606, 620 (S.D.N.Y. 2008). No such intent is present here.

Because Plaintiffs have failed to sufficiently allege the existence of a partnership or joint venture, their breach of fiduciary duty claim premised on Defendants' status as "joint venturers," or as "equity" or "limited" partners, *see* FAC ¶ 152-53, must fail. *See, e.g.*, *Slip-N-Slide Records*, 2014 WL 2119857, at *4 ("Plaintiff's breach of fiduciary duty claim is dismissed because the Amended Complaint fails to allege facts that would give rise to a plausible inference of a joint venture."); *Kidz Cloz, Inc. v. Officially For Kids, Inc.*, 320 F. Supp. 2d 164, 176 (S.D.N.Y. 2004) (holding that plaintiffs' breach of fiduciary duty claim, based on allegations "that defendants breached their fiduciary duty. . . as a partner or joint venturer," failed because "plaintiffs failed to establish the existence of a partnership or joint venture"); *Orderline Wholesale Distribs., Inc. v. Gibbons, Green, van Amerongen, Ltd.*, 675 F. Supp. 122, 128 (S.D.N.Y. 1987) ("Since . . . plaintiffs fail to make a showing sufficient to establish the existence of an enforceable joint venture or partnership agreement with [defendant], they also fail to make a showing sufficient to establish the existence of a fiduciary obligation to them by [defendant]—an element essential to [their breach of fiduciary duty claim]."). Accordingly, Plaintiffs' first cause of action is dismissed.

### C. Breach of Fiduciary Duty as Lender (Count II)

Plaintiffs' second cause of action for breach of fiduciary duty is asserted against Defendants in their capacities as "lenders" or "creditors" to Plaintiffs. *See* FAC ¶¶ 168-71. As noted above, "[w]hen parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." *In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002) (quoting *Pan Am. Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 511 (S.D.N.Y. 1994)). Generally, while "[a] debtor-

creditor relationship is not by itself a fiduciary relationship," the "addition of 'a relationship of confidence, trust, or superior knowledge or control' may indicate that such a relationship exists." *Id.*; *see also Zorbas v. U.S. Tr. Co.*, 48 F. Supp. 3d 464, 480 (E.D.N.Y. 2014) ("The relationship between a borrower and lender is normally conducted at an arm's length and governed solely by the contract between them."); *Matter of Teltronics Servs., Inc.*, 29 B.R. 139, 169 (Bankr. E.D.N.Y. 1983) ("A creditor is not ordinarily a fiduciary of either his debtor or fellow creditors, and owes them no special obligation of fidelity in the collection of his claim."). Thus, "[u]nder ordinary circumstances, a creditor-debtor relationship does not give rise to fiduciary duties." *Infanti v. Scharpf*, 570 F. App'x 85, 88 (2d Cir. 2014).

In certain "rare circumstances," however, a creditor-debtor or lender-borrower relationship may give rise to fiduciary duties. *See Teltronics*, 29 B.R. at 170 ("In the rare circumstance where a creditor exercises such control over the decision-making processes of the debtor as amounts to a domination of its will, he may be held accountable for his actions under a fiduciary standard."). In particular, such a relationship "may give rise to fiduciary duty under New York law where there exists 'a confidence reposed which invests the person trusted with an advantage in treating with the person so confiding, or an assumption of control and responsibility.'" *Roswell Capital Partners LLC v. Alt. Constr. Techs.*, 638 F. Supp. 2d 360, 368-69 (S.D.N.Y. 2009) (quoting *Mfrs. Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 318 (2d Cir. 1993)); *see also Zorbas*, 48 F. Supp. 3d at 480 ("[A] lender-borrower relationship may give rise to fiduciary duty under New York law where the borrower places such confidence and trust in the lender that it invests the person trusted with an advantage in treating with the person so confiding, or an assumption of control and responsibility.") (internal quotation marks and citation omitted). In order to transform an ordinary lender-borrower relationship into a fiduciary relationship, a plaintiff "must allege that, 'apart from the terms of the contract, the parties created a relationship of higher trust than would arise from their contracts alone, so as to permit a cause of

27

action for breach of a fiduciary duty independent of the contractual duties.'" *Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank*, 552 F. App'x 13, 17 (2d Cir. 2014) (alteration and citation omitted).

Plaintiffs argue that they have adequately pleaded a fiduciary relationship here because they have alleged, among other things, that Defendants "played an essential role in driving the strategic planning of the Development," that they "exercise[d] a level of control over the borrower's business," and that they were "in a relationship of confidence, trust, or superior knowledge or control." *See* Opp'n at 20-21 (citing FAC ¶¶ 167-84). Putting aside the conclusory allegations contained in paragraphs 167 through 184 of the Complaint—which consist merely of the allegations pled in "Count II"—the Complaint is devoid of factual allegations supporting Plaintiffs' theory that Defendants, as lenders, "exercise[d] control over [Plaintiffs'] business," *see* Opp'n at 19, or "over the decision-making processes of the debt," *see id.* at 20, or that "a relationship of confidence, trust, or superior knowledge or control" existed between the parties, *see id.* at 19. Plaintiffs do not allege, for instance, that Defendants, as opposed to any of the Plaintiffs, managed or controlled the Obra Pia entities or the Development. *See Roswell Capital*, 638 F. Supp. 2d at 369 ("The law requires present control, not simply an aspiration of control, to support an inference of a fiduciary relationship."); *see also, e.g.*, *Infanti*, 570 F. App'x at 88 ("Without some specific basis to believe that [defendants] had 'assum[ed] control and responsibility' over [plaintiff's] affairs, or that those defendants had some special 'advantage' borne of 'a confidence reposed' in them by [plaintiff], [plaintiff] could not establish that they were fiduciaries.") (citation omitted); *Yanakas*, 7 F.3d at 318 (affirming dismissal of breach of fiduciary duty counterclaim by defendant-borrower against plaintiff-lender, finding that the borrower "did not allege that [the lender] controlled the assets or operations of [a business whose loan was guaranteed by the counter-claimant] or that [the lender] otherwise exercised powers beyond those of a typical lender-creditor"); *Roswell Capital*, 638 F. Supp. 2d at 369 (concluding that the fact that a lender obtained shares of the borrower-corporation in exchange for lending it money did not

give rise to a fiduciary duty—even though ownership of shares is a hypothetical form of control—where no facts were alleged to support the conclusion that the acquisition of the stocks led to an actual exertion of shareholder-based control over the borrower).  Nor have Plaintiffs pled sufficient facts that could establish that the parties were engaged in a relationship of "higher trust than would arise from their contracts alone," *Fillmore*, 552 F. App'x at 17 (alteration and citation omitted), or that Defendants had any particular "superior knowledge or control" with respect to the relationship, *In re Mid-Island Hosp.*, 276 F.3d at 130.  Because Plaintiffs have failed to adequately plead that Plaintiffs, as borrowers/debtors, and Defendants, as lenders/creditors, were in a fiduciary relationship, Plaintiff's second cause of action must be dismissed.

## II.      Plaintiffs' Breach of Contract Claim (Count III)

Plaintiffs next assert a claim for breach of contract, alleging that Defendants breached the Subordination Agreement by filing the SDS Complaints and the BVI Statutory Demand.  *See* FAC ¶¶ 186-90.[11]  As an initial matter, Defendants argue that Plaintiffs' breach of contract claim should be dismissed because Plaintiffs "lack standing even to invoke § 1(a) of the Subordination Agreement." Mot. at 12-13.  According to Defendants, the "plain language" of the Subordination Agreement "is exclusively 'for the benefit of and enforceable by the Senior Lender,'" i.e., GACP, and thus, Plaintiffs are unable to assert any claims with respect to such enforcement.  *See id.* at 13.  The Court disagrees. It is axiomatic that parties to a contract have standing to enforce its terms and, specifically, "to sue for breach of contract."  *See Veleron Holding, B.V. v. BNP Paribas SA*, No. 12 Civ. 5966 (CM), 2014 WL 12699263, at *20 (S.D.N.Y. Apr. 16, 2014); *see also Clalit Health Servs. v. Israel Humanitarian Found.*, No. 02 Civ. 6552 (DC), 2003 WL 22251329, at *3 (S.D.N.Y. Sept. 30, 2003) ("Parties to a contract have standing to assert a breach of contract claim."); *24/7 Records, Inc. v. Sony Music Entm't,*

---

[11] Plaintiffs' breach of contract cause of action is brought only with respect to the Subordination Agreement, and not any of the other prior agreements.  *See* Opp'n at 20 n.11.

*Inc.*, 566 F. Supp. 2d 305, 315 (S.D.N.Y. 2008) ("24/7 has standing to bring the breach of contract claim because it is party to the distribution agreement with Artemis."). Defendants concede, as they must, that Plaintiffs—aside from Tuzman individually—are signatories to the Subordination Agreement. *See* Mot. at 13. Plaintiffs thus have standing to assert the instant breach of contract claim.

"To state a claim for breach of contract under New York law, a plaintiff must allege '(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" *Landmark Ventures, Inc. v. Wave Sys. Corp.*, 513 F. App'x 109, 111 (2d Cir. 2013) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)). Plaintiffs assert that Defendants breached the Subordination Agreement—specifically § 1(a), which they contend provided that "no payments were due to [Defendants] until the Senior Loan was repaid in full"—by filing the SDS Complaints and BVI Statutory Demand, "alleging non-payment of amounts owed to [Defendants] and seeking dissolution of Obra Pia in satisfaction of such non-payment." FAC ¶ 190. Defendants breached this Agreement, Plaintiffs allege, because at the time they made such filings, as well as submitted the "purported notices of default," the "Senior Loan had not yet been paid." *Id.* ¶ 191.

Under the Subordination Agreement, the "Senior Loan" is defined as the $1.5 million payment that GACP advanced to the parties—$1 million to Seagrape and $500,000 to Obra Pia. *See* Subordination Agreement, Recitals 2-3. Plaintiffs are correct that, pursuant to the Subordination Agreement, Seagrape agreed that the debt Obra Pia owed to it would be "subordinate and junior in right of payment to the prior payment in full of the Senior Loan and the obligations under the Senior Loan Documents." Subordination Agreement § 1(a). Pursuant to this section, Seagrape also agreed not to "declare a default with respect to any Subordinated Loan" or "exercise any rights with respect to any collateral securing the Subordinated Loans" without first providing the "Senior Lender," i.e.,

30

GACP, "at least three (3) months advanced notice." *Id.*   It is not clear, however, that Seagrape breached the Subordination Agreement by declaring a default or filing the SDS Complaints or BVI Statutory Demand simply because it did so before the Senior Loan was repaid in full.   Based on the plain language of § 1(a), for instance, it appears that all Seagrape had to do before declaring a default or exercising its rights as a creditor was wait for the Foreclosure Date to pass and provide GACP three months notice of such an intent.   Nothing in § 1(a)—or elsewhere in the Subordination Agreement— contains language requiring the Senior Loan to be fully repaid before Seagrape could "declare a default" or "exercise any rights with respect to any collateral."   That Seagrape agreed to be "subordinate and junior" to GACP does not change this conclusion.

In fact, pursuant to § 1(b), the parties agreed further that, as to the "prior funding of Obra Pia" and the Development, governed by the Investment Agreement, Addendum, and/or CSA, they would "not [] foreclose until March 31st, 2017" and would "waive any [] restriction in any of the foregoing documents that might otherwise restrict, prohibit, create a breach or an event of default thereunder in connection with the transaction contemplated under the Senior Loan Documents."   Subordination Agreement § 1(b).   This language evinces the parties' intent to allow Seagrape to foreclose under the terms of the CSA after March 31, 2017, so long as GACP was provided three months notice pursuant to § 1(a).   Thus, based on a plain reading of the CSA and the Subordination Agreement, Seagrape was authorized to declare a default and exercise its rights after March 31, 2017, as long as it provided the requisite notice to GACP.   Section 2 of the Subordination Agreement further supports this conclusion, as it appears to contemplate that a Subordinated Lender may declare a default prior to the Senior Loan being repaid in full.   In particular, § 2 provides that, "[i]f during the continuation of an event of default . . . , a payment or distribution is made to any Subordinated Lender that because of this Agreement should not have been made to them, such Subordinated Lender who receives the distribution shall hold it in trust for the Senior Lender, segregated from other funds and property held by such

Subordinated Lender, and pay it over to the Senior Lender." Subordination Agreement § 2. The Agreement therefore provided for the situation in which a Subordinated Lender, like Seagrape, declared a default and received a certain amount, even before GACP's loan was fully repaid. In that event, Seagrape would be required to hold in trust the amount owed to GACP—i.e., the $1.5 million payment—and pay it over to GACP. If Seagrape was prohibited from taking any such actions prior to GACP being repaid, as Plaintiffs contend, then § 2 would be superfluous. *See Hildene Capital Mgmt., LLC v. Friedman, Billings, Ramsey Grp., Inc.*, No. 11 Civ. 5832 (AJN), 2012 WL 3542196, at *5 (S.D.N.Y. Aug. 15, 2012) ("A contract should be read as a whole . . . to avoid an interpretation that would render a provision superfluous.").

Because Plaintiffs' breach of contract claim is based on Defendants' taking allegedly wrongful actions prior to the Senior Loan being repaid in full, *see* FAC ¶ 190, and nothing in the Subordination Agreement actually prohibits Defendants from having done so, Plaintiffs have not sufficiently pled that Defendants breached the Subordination Agreement. Plaintiffs' breach of contract claim is therefore dismissed.

### III.   Plaintiffs' Breach of Covenant of Good Faith and Fair Dealing Claim (Count IV)

Plaintiffs next assert a claim for Defendants' alleged breach of the covenant of good faith and fair dealing. "In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance." *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002); *see also Galvstar Holdings, LLC v. Harvard Steel Sales, LLC*, 722 F. App'x 12, 16 (2d Cir. 2018) ("Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract.") (quoting *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002)). This covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995)

(internal quotation marks and citation omitted).  In addition, the covenant "encompass[es] any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *511 W. 232nd Owners*, 98 N.Y.2d at 153 (internal quotation marks and citation omitted).  "The implied covenant does no more than this, however; it works only to ensure that a party with whom discretion is vested does not act arbitrarily or irrationally." *19 Recordings*, 97 F. Supp. 3d at 438 (internal quotation marks and citation omitted).  "For this to occur, a party's action must directly violate an obligation that may be presumed to have been intended by the parties." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407-08 (2d Cir. 2006) (internal quotation marks and citation omitted).  Nevertheless, the covenant "does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." *Id.* at 408.  "New York law is clear," moreover, "that the implied covenant cannot be used to create independent obligations beyond the contract." *ARI & Co. v. Regent Int'l Corp.*, 273 F. Supp. 2d 518, 523 (S.D.N.Y. 2003).

"To state a claim for breach of this covenant, a plaintiff must plead that (1) the defendant owes the plaintiff a duty to act in good faith and conduct fair dealing; (2) the defendant breached that duty; and (3) the breach of duty proximately caused the plaintiff's damages." *Great Lakes Reinsurance (UK) SE v. Herzig*, 413 F. Supp. 3d 177, 183 (S.D.N.Y. 2019) (alterations, internal quotation marks, and citation omitted).  Plaintiffs allege that Defendants breached their duties of good faith and fair dealing pursuant to the Investment Agreement, Addendum, CSA, and Subordination Agreement.  *See* FAC ¶¶ 195-97.  Defendants allegedly did so by taking certain actions "to injure [] Tuzman and sabotage the value of the Development," which "impair[ed] Plaintiffs' ability to sell or market the Development to third-party buyers," FAC ¶ 200, and by seeking "relief, pursuant to the SDS complaints and the BVI Statutory Demand, to which they were not entitled under the [relevant] agreements," *id.* ¶ 201, including by seeking "repayment" of "funds which they expressly agreed were

subordinate to the senior loan of GACP" and of "a 'loan' with usurious interest and penalties which should prohibit [them] from any recovery at all," *id.* at 202.[12]  In their opposition, Plaintiffs rely primarily on CSA § 11, arguing that § 11 provided "a reasonable expectation" that Defendants would "exercise [their] best efforts to support Debtors' sale of all or a portion of the Project that would result in repayment of the Cash Amount Due," and would not "do anything to block such a sale."  *See* Opp'n at 17 (quoting CSA § 11).  According to Plaintiffs, this included "reasonable expectations" that Defendants "would not intentionally undertake conduct to personally injure [] Tuzman or to sabotage the value of the Development."  *See id.* at 18.

Plaintiffs have not, however, sufficiently alleged "facts which tend to show that [Defendants] sought to prevent performance of the contract or to withhold its benefits from the plaintiff."  *Fillmore*, 552 F. App'x at 16 (citation omitted).  Nor have they adequately pleaded that Defendants' actions "directly violate[d] an obligation that may be presumed to have been intended by the parties," as is required.  *Galvstar Holdings*, 722 F. App'x at 16.  Indeed, in the same section of the CSA on which Plaintiffs rely, the parties also agreed that Plaintiffs would "fully cooperate to facilitate Seagrape's foreclosing on the property" and would not "block such foreclosure or cooperate with anyone seeking to block it."  CSA § 11.  This line directly precedes the language that Plaintiffs cite regarding Seagrape's "best efforts."  *See id.*  Based on the language of the CSA, it thus seems that Seagrape's obligation to "exercise best efforts to support [Plaintiffs'] sale" of the Development applied in the

---

[12] Plaintiffs' breach of the implied covenant claim is broader than their breach of contract claim and therefore not duplicative.  *See Dorset Indus., Inc. v. Unified Grocers, Inc.*, 893 F. Supp. 2d 395, 405 (E.D.N.Y. 2012) ("[A] plaintiff may bring two breach of contact claims, one based on breach of the express terms and the other based on breach of the implied duty, as long as they are supported by factually distinct allegations.") (internal quotation marks and citation omitted).  In particular, the breach of contract claim is based only on the Subordination Agreement, while the breach of the implied covenant claim is based on all four agreements between the parties.  Moreover, the breach of contract claim is premised on Defendants' filing of the SDS Complaints and BVI Statutory Demand, while the breach of the implied covenant claim also encompasses Plaintiffs' allegations that Defendants took certain actions to injure Tuzman personally and "sabotage the value of the Development, impairing [their] ability to sell or market the Development to third-party buyers," FAC ¶ 200, as well as "wrongfully sought repayment of a 'loan' with usurious interest and penalties," *id.* ¶ 202.

event that Seagrape did not assert its foreclosure rights.  *See Fillmore*, 552 F. App'x at 16 ("[T]he covenant of good faith and fair dealing is implicit in every contract under New York law, but it cannot be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights.") (internal quotation marks and citation omitted); *UBS AG v. Cournot Fin. Prods., LLC*, No. 10-CV-0494 (GBD), 2010 WL 3001884, at *2 (S.D.N.Y. July 26, 2010) ("New York law precludes the implied covenant of good faith and fair dealing to read into the agreement obligations at odds with the express contractual rights of the parties.").  Plaintiffs have not demonstrated how Mullen's withdrawal of his signature on Tuzman's PBR, or Defendants' filing of the SDS Complaints and BVI Statutory Demand, for instance, constitute anything more than Defendants' "general right to act on its own interests in a way that may incidentally lessen [Plaintiffs'] anticipated fruits from the contract." *Fillmore*, 552 F. App'x at 16.  Accordingly, Plaintiffs' breach of the covenant of good faith and fair dealing is dismissed.

## IV.    Plaintiffs' Fraud Claim (Count V)

Plaintiffs next bring a claim for fraud against Defendants.  "To state a claim for common law fraud in New York, a plaintiff must allege '(1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff.'" *Haggerty v. Ciarelli & Dempsey*, 374 F. App'x 92, 94 (2d Cir. 2010) (quoting *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997)).  Additionally, a claim for fraud must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 197 (2d Cir. 2013) (citation omitted); *see also Foley v. Wilson*, No. 18-CV-504 (RA), 2020 WL 30338, at *6 (S.D.N.Y. Jan. 2, 2020) ("Where the plaintiff asserts a claim for fraud, the plaintiff must also satisfy the heightened pleading standards of Federal Rule of

Civil Procedure 9(b).").

Plaintiffs' fraud claim is based on alleged misstatements and omissions that Defendants made in the SDS Complaints and the BVI Statutory Demand.  Plaintiffs allege, for instance, that Defendants made "material misrepresentations of fact" in the SDS Complaints by "alleging that the Obra Pia entities had defaulted in payment obligations owed to [them] and [to] Barrera & Barrera," FAC ¶ 207, and that they failed to disclose to the SDS that they were "in fact, subordinate to GACP and *pari passu* with other creditors," *id.* ¶ 208.  As to the BVI Statutory Demand, Plaintiffs assert that Defendants made false statements by representing they were "owed $5,099,917.49 based on [Obra Pia's] guarantee under the [Investment] Agreement, the [] Addendum, and the CSA, each of which were superseded by the Subordination Agreement," *id.* ¶ 218, and that they wrongfully failed to disclose that their investment was "subordinate to other lenders," *id.* ¶ 219.  Although Plaintiffs allege—in conclusory fashion—that Defendants "intended for Plaintiffs, as well as the SDS, to rely on [the] false statements and representations" contained in the SDS Complaints, *id.* ¶ 213, and that they similarly "intended for Plaintiffs to rely . . . on the false statements contained in the BVI Statutory Demand," *id.* ¶ 220, their fraud claim nonetheless fails because Plaintiffs do not plead that Defendants made any fraudulent statements or omissions to *Plaintiffs*.

It is well settled that "fraud claims may not be premised on false statements on which a third party relied." *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 400 F. App'x 611, 613 (2d Cir. 2010).  A plaintiff thus "does not establish the reliance element of fraud for purposes of . . . New York law by showing only that a third party relied on a defendant's false statements" *Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo*, 148 F.3d 194, 196 (2d Cir. 1998); *see also City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 454 (2d Cir. 2008) ("[A]llegations of third-party reliance . . . are insufficient to make out a common law fraud claim under New York law.").  Indeed, the New York Court of Appeals has specifically "decline[d] to extend the reliance

36

element of fraud to include a claim based on the reliance of a third party," reasoning that "the tort of fraud is intended to protect a party from being induced to act or refrain from acting based on false representations—a situation which does not occur where . . . the misrepresentations were not communicated to, or relied on, by plaintiff." *Pasternack v. Lab. Corp. of Am. Holdings*, 27 N.Y.3d 817, 829 (2016).

As such, courts in this Circuit have dismissed claims for fraud where plaintiffs have failed to allege that defendants' false or misleading statements were made to and/or relied on by plaintiffs themselves. *See, e.g.*, *Smokes-Spirits.com*, 541 F.3d at 454 (affirming dismissal of the City's common law fraud claims because the "City failed to plead 'reasonable reliance *on the part of the plaintiff*'") (emphasis in original); *Durosene v. Bank of Am., N.A.*, No. 19-CV-4181 (JMA) (ARL), 2020 WL 3403083, at *4 (E.D.N.Y. June 19, 2020) (concluding that plaintiff could not "bring a fraud claim premised on [alleged statements defendants made during foreclosing proceedings] because such statements were not made to Plaintiff—who was not a party to the Foreclosure Action—or relied on by Plaintiff"); *Tesla Wall Sys., LLC v. Related Cos., L.P.*, No. 17-CV-5966 (JSR), 2018 WL 4360777, at *4 (S.D.N.Y. Aug. 15, 2018) ("The complaint makes no allegations of any material false representations made by defendant to plaintiff, a material pleading defect given that fraud requires that the *plaintiff* relied on the defendant's misrepresentation.  Instead, the complaint bases the fraud claim solely on the allegation that defendant [] 'made multiple misrepresentations of fact to fraudulently induce [a third party] . . . .").  Plaintiffs' allegations that Defendants made allegedly false statements and omissions to the SDS and to the BVI Court are therefore insufficient to support their fraud claim.  Accordingly, this claim is dismissed.

## V.    Plaintiffs' Declaratory Judgment Claim (Count VI)

Lastly, Plaintiffs seek a declaration, presumably under the Declaratory Judgment Act, that "by nature of usurious and otherwise illegal interest rates and penalties, as well as [Defendants']

indisputably subordinated position, [Defendants] are not entitled to collect any sum under the relevant agreements."  FAC ¶ 227.

"The Declaratory Judgment Act . . . provides the procedural mechanism for granting declaratory relief in federal diversity cases."  *Am. Standard, Inc. v. Oakfabco, Inc.*, 498 F. Supp. 2d 711, 715 (S.D.N.Y. 2007).  It does not, however, "provide an independent cause of action."  *In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d 726, 731 (2d Cir. 1993).  Rather, the Act provides "a form of relief previously unavailable," such that "a court may only enter a declaratory judgment in favor of a party who has a substantive claim of right to such relief."  *Id.*; *see also Nahabedian v. Intercloud Sys., Inc.*, No. 15-CV-00669 (RA), 2016 WL 155084, at *5 (S.D.N.Y. Jan. 12, 2016) ("Importantly, it is well established that [declaratory relief] is a remedy, not a cause of action, and therefore can issue only on the basis of an independent claim for relief.") (alteration, internal quotation marks, and citation omitted); *Bhanusali v. Orange Reg'l Med. Ctr.*, No. 10-CV-6694 (CS), 2012 WL 13059694, at *9 (S.D.N.Y. Jan. 20, 2012) ("[A] declaratory judgment . . . is not a cause of action, but a form of relief that may be available if [plaintiff's] substantive claims have merit.") (citation omitted).  And, "a request for relief in the form of a declaratory judgment does not by itself establish a case or controversy involving an adjudication of rights."  *In re Joint E. & S. Dist.*, 14 F.3d at 731.

A district court has "broad discretion to decide whether to render a declaratory judgment."  *In re Orion Pictures Corp.*, 4 F.3d 1095, 1100 (2d Cir. 1993); *see also Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003) ("Courts have consistently interpreted [the Act's] permissive language as a broad grant of discretion to district courts to refuse to exercise jurisdiction over a declaratory action that they would otherwise be empowered to hear.").  To decide whether to entertain an action for a declaratory judgment, courts consider "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty."  *Duane Reade, Inc. v. St. Paul Fire & Marine Ins.*

*Co.*, 411 F.3d 384, 389 (2d Cir. 2005) (citing *Broadview Chem. Corp. v. Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir. 1969)).

As noted, "a court may only enter a declaratory judgment in favor of a party who has a substantive claim of right to such relief." *In re Joint E. & S. Dist.*, 14 F.3d at 731.  Thus, where a plaintiff's substantive claims are dismissed, a claim for a declaratory judgment—asserted as a separate cause of action—is properly dismissed as well.  *See, e.g.*, *Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 484 (S.D.N.Y. 2015) ("Given that Yu has failed to establish his other claims, and the declaratory relief sought rests on those claims, his claim for declaratory judgment also fails."); *KM Enters., Inc. v. McDonald*, No. 11-CV-5098 (ADS) (ETB), 2012 WL 4472010, at *19 (E.D.N.Y. Sept. 25, 2012), *aff'd,* 518 F. App'x 12 (2d Cir. 2013) (dismissing "the only remaining causes of action in the Amended Complaint—namely, the counts for a 'declaratory judgment' and an 'injunction'" because plaintiff "cannot survive a motion to dismiss by relying on these claims as independent causes of action"); *HARR, LLC v. Town of Northfield*, 423 F. Supp. 3d 54, 67 (D. Vt. 2019) (dismissing plaintiff's "request for declaratory relief in Count I" because the court had "granted judgment on the pleadings in favor of Defendant on Plaintiff's substantive claims").  Because Plaintiffs' substantive claims have been dismissed, and because Plaintiffs cannot maintain an independent cause of action as to their request for a declaratory judgment, the Court dismisses their declaratory judgment cause of action.

## VI.    Obra Pia's Cross-Motion for Domestication of Foreign Judgment

After Defendants moved to dismiss the Complaint, Obra Pia filed a cross-motion, pursuant to N.Y. CPLR Article 53, seeking recognition and enforcement of a "foreign country money judgment" entered in its favor against Seagrape by the BVI Court, *see* Cross-Motion at 1, also known as "domestication," *see Servipronto De El Salvador, S.A. v. McDonald's Corp.*, No. 11 Civ. 4519 (KPF),

2020 WL 1673903, at *6 (S.D.N.Y. Apr. 6, 2020).[13]  Specifically, Obra Pia seeks recognition and enforcement of the $40,200 amount of application costs that the BVI Court had ordered Seagrape to pay by June 6, 2019, plus interest.  *See* Cross-Motion at 1; Giardino Decl. Ex. 6 at 1.

Article 53 "applies to any foreign country judgment which is final, conclusive and enforceable where rendered even though an appeal therefrom is pending or it is subject to appeal."  N.Y. CPLR § 5302.  "Foreign country judgment" is defined as "any judgment of a foreign state granting or denying recovery of a sum of money, other than a judgment for taxes, a fine or other penalty, or a judgment for support in matrimonial or family matters."  *See* N.Y. CPLR § 5301.  Section 5303 provides that, except as set forth in § 5304, a foreign country judgment is "enforceable by an action on the judgment, a motion for summary judgment in lieu of [a] complaint, or in a pending action by counterclaim, cross-claim or affirmative defense."  N.Y. CPLR § 5303.  Section 5304, in turn, provides mandatory and discretionary grounds for non-recognition of a foreign judgment.  *See* N.Y. CPLR § 5304(a) (mandatory grounds); N.Y. CPLR § 5304(b) (discretionary grounds).  Article 53 has a "limited purpose" to "recogniz[e] a foreign judgment and convert[] it into a New York judgment."  *Servipronto De El Salvador*, 2020 WL 1673903, at *7.  It was "designed" as a means "to promote the efficient enforcement of New York judgments abroad by assuring foreign jurisdictions that their judgments would receive streamlined enforcement here."  *CIBC Mellon Tr. Co. v. Mora Hotel Corp. N.V.*, 100 N.Y.2d 215, 221 (2003).  "Crucially, the party seeking domestication under Article 53 does not seek any *new relief* against the judgment debtor, but instead merely asks the court to perform its ministerial function of recognizing the foreign country judgment and converting it into a New York judgment."  *Servipronto De El Salvador*, 2020 WL 1673903, at *6 (quoting *CIBC Mellon*, 100 N.Y.2d at 222)

---

[13] The other Plaintiffs do not join Obra Pia's cross-motion.

(internal quotation marks omitted); *see also Abu Dhabi Commercial Bank PJSC v. Saad Trading, Contracting & Fin. Servs. Co.*, 117 A.D.3d 609, 611 (1st Dep't 2014).

Regardless of the merits of Obra Pia's request for domestication—which the Court does not address—its cross-motion fails because it is procedurally improper. CPLR § 5303 is clear that a claim for recognition and enforcement of a foreign judgment may be brought in one of three ways: "an action on the judgment, [i.e., a complaint], a motion for summary judgment in lieu of [a] complaint, or in a pending action by counterclaim, cross-claim or affirmative defense." N.Y. CPLR § 5303. Here, however, Obra Pia has not moved for domestication in any of the three permissible manners. It has not filed an action on the judgment, as the Complaint fails to even mention the $40,200 amount it seeks or that the BVI Court ordered Seagrape to pay Obra Pia's costs more generally. Nor has Obra Pia filed a motion for summary judgment in lieu of a complaint. And it would make little sense for Obra Pia to assert this claim as a counterclaim, cross-claim, or affirmative defense as it is a plaintiff in the action. Rather, Obra Pia has brought its domestication request on a cross-motion to Defendants' 12(b)(6) motion to dismiss—a procedural mechanism not provided for in § 5303.

Notably, Obra Pia has failed to cite any legal authority supporting its contention that a claim for domestication may be brought as it has here, on a cross-motion filed in response to a defendant's motion to dismiss, even after Defendants expressly argued that its motion was improper under § 5303. *See* Defs. Opp'n at 10. New York courts have found that, to the contrary, a request for domestication brought in the form of such a motion may be dismissed as "procedurally improper." *See Beijing Zhong Xian Wei Ye Stainless Decoration Ctr. v. Guo*, No. 653176/2017, 2020 WL 2404938, at *1, 3 (N.Y. Sup. Ct. May 7, 2020) (denying plaintiffs' cross-motion, "pursuant to CPLR 5303[,] to recognize and enforce a series of foreign judgments purportedly rendered in the People's Republic of China" as "procedurally improper" because plaintiffs "did not bring 'an action on the judgment, a motion for summary judgment in lieu of complaint, or in a pending action by counterclaim, cross-

41

claim or affirmative defense,'" as required under CPLR § 5303, but rather, sought "recognition of the judgments by cross-motion, which is not permissible under CPLR 5303"); *see also Maricultura del Norte, S. de R.L. de C.V. v. WorldBusiness Capital, Inc.*, No. 14 Civ. 10143 (CM), 2020 WL 747207, at *1, 5 (S.D.N.Y. Feb. 14, 2020) (denying defendant's request for recognition of a judgment issued in Mexico upon its motion pursuant to Fed. R. Civ. P. 60(b), because "a motion under Fed. R. Civ. P. 60(b) is not one of the three types of proceedings in which [Article 53] may be invoked," and because such a "procedural defect" was "fatal" to the request).

Accordingly, Obra Pia's cross-motion is denied.

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is granted and Obra Pia's cross motion for domestication of a foreign judgment is denied.  The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 25 and 33, and close this case.

SO ORDERED.

Dated:    September 25, 2020
          New York, New York

_____
Ronnie Abrams
United States District Judge